HOPKINS, J. T. C.
This is an appeal from the judgments of the Passaic County Board of Tax Appeals as to the assessed value of property described as Block 596, Lot 16, in the taxing district of Wayne.
The following schedule shows original assessment, County Board judgment and claimed assessment values of the parties:
Year Assessment County Board Taxpayer Taxing District
1976 $1,199,300 $1,199,300 $971,000 $1,350,000
1977 $1,199,300 $1,199,300 $916,000 $1,350,000
1978 $1,199,300 $1,199,300 $920,000 $1,350,000
The issues presented to the court are (1) what is the true value of "subject property as of the appropriate assessment dates; and (2) whether the provisions of Chapter 123 of the Laws of 1973 apply to taxable year 1978. As no evidence was presented in support of the allegation of a discriminatory assessment for 1976 and 1977, it is concluded that plaintiff has abandoned that issue.
Subject property is an irregularly shaped parcel having 491 foot frontage on Valley Road, 210 foot frontage along Paterson-Hamburg Turnpike, and approximately 400 foot frontage along Hinchman Avenue, in an area of 10.13 acres, in the Township of Wayne. The parcel is at street grade with both Paterson-Hamburg Turnpike and Hinchman Avenue, while the bulk of the property is approximately 10 to 15 feet below the grade of Valley Road. There is an access ramp from Valley Road.
*5 The property is improved with three separate structures. The main structure is a retail store building containing 14 separate tenants. The general finish of this building consists of an all masonry exterior with face brick front and a flat, built up roof over metal decking. The interiors have all concrete floors with T-bar grid ceilings, a mixture of masonry and dry wall partitioning and asphalt tile floors. The individual stores are fully heated and airconditioned by combination units and have adequate toilet facilities throughout the building. The building is fully sprinkler protected. This building was built so that there would be a major supermarket tenant with satellite stores. The last major tenant was Pantry Pride, which closed down operations prior to the years involved. However, rentals were paid until 1977. That tenant had subleased the store for two years to a freight salvage company. The subtenant moved out at the end of the term.
The second building was a former Robert Hall retail store which, in 1977, was converted into a computer center for a Savings and Loan Association. This building has brick veneer exterior walls with a flat, built up roof. Interior finish consists of generally asphalt tile over concrete floors, T-bar grid ceilings and dry wall partitioning. The heat is provided by a combination forced hot air and airconditioning unit. The building has strip fluorescent lighting and adequate toilet fixtures. It is fully sprinkler protected.
The third building on the lot is a car wash having masonry exterior walls with a gable type asphalt shingle roof. The interior has essentially no finish except for a 250 square foot office and waiting area having panelled walls and T-bar grid ceilings. This area is the only space that is heated and airconditioned. In addition, there are men’s and ladies’ toilet facilities. This building is owned by the operator of the car wash who leases the land from plaintiff under a 99 year lease at $10,000 a year.
Other improvements include a metal deck canopy running the entire length of both the retail buildings and computer center, *6 covering the sidewalk access areas. In addition, the main retail area has two concrete loading docks in the rear of the building. There is exterior lighting used in illuminating the parking area of approximately 200,000 square feet. This parking area is paved with macadam paving and contains curbing.
Under date of July 22, 1976, John M. Galesi and M. Michael Galesi, individuals, entered into an agreement with Wayne Mall, Inc., relative to the sale by the Galesis of property located in Endicott, New York, known as “Goodyear Property” at a price of $60,000 in excess of the mortgage on said property. As part of that same agreement, Wayne Mall, Inc., agreed to sell a one-half interest in the subject property to the Galesis for $175,000 in excess of the balance due on two mortgages on the property whose principal balances would not exceed $567,997.46 as of the closing date. The contract further provided that the Galesis had a six year option to purchase the remaining one-half interest for an equal $175,000 plus 50 percent of the reduction in the principal balances of the mortgages and 50 percent of any capital expenditures made by Wayne Mall, Inc., reduced by depreciation.
The aforesaid contract permitted Wayne Mall, prior to August 10, 1976, to elect not to purchase the Goodyear property. The closing statement as of June 30, 1976, relative to the sale of the one-half interest in the subject property was consistent with those provisions of the contract indicating that the Goodyear property was not acquired by Wayne Mall, Inc.
Plaintiff introduced testimony through an expert witness in support of its position that the true value as of October 1, 1975, October 1, 1976, and October 1, 1977, was in the respective amounts of $971,000, $916,000 and $1,000,000. In reaching that conclusion, plaintiff’s expert utilized both the cost analysis approach and an economic analysis approach for all years.
In both approaches, a land value of $50,000 an acre for all years was utilized.
In the cost analysis approach as of October 1, 1975, plaintiff’s appraiser utilized the real property appraisal manual for New *7 Jersey Assessors and concluded that the construction costs of the improvements, as of that date, after taking into consideration physical depreciation of 20 percent and a functional-economic depreciation of 55 percent, amounted to $932,300. He added a figure of $26,400 to his cost to reflect the depreciated value of the car wash. He testified that under the cost analysis approach, the value of the improvements amounted to $442,200 which, when added to the value he attributed to the land, namely $506,500, amounted to $958,700.
Under the economic analysis approach as of October 1, 1975, plaintiffs appraiser utilized actual rents, together with receipts from tenants for maintenance participation, tax participation, and overages and telephone commissions, to reach a gross income of $197,161. From this he deducted a vacancy and credit loss of 5 percent, giving him an effective gross income of $187,303. Utilizing actual expenses for utilities, payroll, payroll taxes, insurance, repairs and maintenance, and legal and accounting fees, together with a 5 percent management fee and a 2 percent reserve for replacements, he arrived at a net income, before taxes and recapture, of $131,855. Valuing the land at $506,500 and using a capitalization rate of 12.79 percent, he arrived at a figure of $64,781 as being attributable to the land. The capitalization rate was arrived at by assuming a 75 percent mortgage at 9 percent, an equity of 25 percent at 12 percent, and a tax rate of 3.04 percent. The balance of $67,074, which he attributed to the building, he capitalized at a rate of 15.29 percent which consisted of the aforesaid 12.79 percent plus a recapture rate of 2.5 percent predicated on a 40 year life. His computations resulted in a value to the buildings of $438,700 which, when added to the land value of $506,500, gave him a total of $945,200. To this he added a figure of $26,400, representing the value of the car wash. This gave him a total value, under the economic analysis approach, of $971,600 as of October 1, 1975. He considered the economic analysis approach to be most reflective of the actions of buyers and sellers for property such as the subject property and he therefore concluded that the subject property, as of October 1, 1975, should be valued at $971,000.
*8 In plaintiff’s approach, with respect to the true value as of October 1, 1976, he again valued the land at $50,000 an acre for a total of $506,500. He used the same approach that he utilized in the cost analysis for the 1976 year with the exception that his cost conversion factor was different. He valued both land and property at $949,800 plus $27,600 for the car wash building, or a total of $977,400. In his economic analysis for the taxable year 1977, he totalled rent, maintenance participation, tax participation and overages and telephone commissions to reach a gross income of $197,603. From this he subtracted a 5 percent vacancy and credit loss, giving him an effective gross income of $187,723. He deducted actual expenses for the fiscal year ending June 30, 1977, for utilities, payroll, payroll taxes, insurance, repairs and maintenance, and legal and accounting fees, together with 5 percent management fees and a 2 percent reserve for replacement, giving him a total expense deduction of $62,937. This resulted in a net income, before taxes and recapture, of $124,786. From this he deducted $65,693 as being attributable to the land based on an estimated value of $506,500, and a capitalization figure of 12.97 percent. This was the same base rate used for 1976 with a tax rate of 3.22 percent.
The balance of $59,093, which he attributed to the retail building and the Robert Hall building, he capitalized at a rate of 15.47 percent, which included a recapture rate of 2.5 percent predicated on a 40 year life. His computations resulted in a value to the two buildings of $382,000 which, when added to the land value of $506,500, gave him a total of $888,500. To this he added a figure of $27,600, representing the depreciated value of the car wash. This gave him a total value, under the economic analysis approach, of $916,100, as of October 1, 1975. Again he considered the economic analysis approach to be the most reflective of the actions of buyers and sellers for property such as the subject property and he therefore concluded that the subject property, as of October 1, 1976, should be valued at $916,100.
With respect to the taxable year 1978, with the critical date being October 1, 1977, plaintiff’s appraiser valued the land at $54,000 an acre, or a total of $547,000. He used the same *9 approach that he utilized in the cost analysis for the 1975 and 1976 years with the exception that his cost conversion factor was different. He valued both land and the two buildings owned by the taxpayer at $998,400 plus a value of $28,200 attributable to the depreciated value of the car wash, arriving at a total value as of October 1,1977, of $1,026,600. In his economic analysis for the taxable year 1977, he again totalled rent, maintenance participation, tax participation, overages and telephone commissions to reach a gross income of $230,568. From this he subtracted a 5 percent vacancy and credit loss, giving him an effective gross income of $219,040. He deducted actual expenses for the fiscal year ending June 30, 1978, for utilities, payroll, payroll taxes, insurance, repairs and maintenance, and legal and accounting fees, together with a 5 percent management fee and a 2 percent reserve for replacement, giving him a total expense deduction of $81,704. This resulted in a net income, before taxes and recapture, of $137,336. From this he deducted $71,329 as being attributable to the land, based on an estimated value of $547,000, and a capitalization rate of 13.04 percent. This base rate was arrived at by assuming a 75 percent mortgage at 9.5 percent interest and an equity of 25 percent at a 12 percent return. This resulted in a base rate of 10.13 percent which, when added to the estimated effective tax rate of 2.91 percent, resulted in the 13.04 percent capitalization rate. The balance of $66,007, which he attributed to the two buildings, was capitalized at a rate of 15.54 percent, which included a 2.5 percent recapture, to arrive at a value of $424,755. To the values attributable to the land and two buildings he added the amount of $28,200 as being attributable to the car wash. This resulted in a total value as of October 1,1977, of $1,000,000. He considered the economic analysis approach to be the most reflective of the actions of buyers and sellers for property such as the subject property, and he therefore concluded that the subject property, as of October 1, 1977, should be valued at $1,000,000.
The defendant’s appraiser utilized both the reproduction cost approach and the income approach in reaching his conclusion as to the value of the subject property as of the critical dates. He *10 also utilized comparable vacant land sales to arrive at a value of the land for the periods involved. With respect to the taxable year 1976, with a critical date as of October 1, 1975, he valued the property at $70,000 an acre, or a total of $709,100. He valued the improvements, on a reproduction cost approach, at $22.00 per square foot for both the main building and the office building, giving respective values of $906,400 and $184,800. He valued the car wash at $18.00 a square foot, giving it a value of $82,656. He valued the canopy and loading dock at $50,000 and macadam paving and exterior lighting at $200,000. These improvements totalled $1,423,460. He deducted a 25 percent depreciation, physical and economic, in the amount of $355,865, coming up with a depreciated improvement value of $1,067,595. To this he added the land value of $709,100, giving him a total value by the reproduction cost approach, of $1,776,695, or $1,777,000. Under the income approach with respect to the 1976 tax year, defendant’s expert utilized gross rents of $165,180 and deducted therefrom a vacancy and rent loss of 5 percent. To this he added tenant contributions of $31,981, for a total effective gross income of $188,902. The aforesaid tenant contributions totalled the same amount as the three items utilized by plaintiff’s expert designated maintenance participation, tax participation, and overages and telephone commissions.
His expenses consisted of a 5 percent management fee, actual electric and gas expenditures, actual payroll and payroll taxes, actual insurance premiums, repairs and maintenance of $7,890, and a miscellaneous expense equal to 2 percent of effective gross income. His total expenses amounted to $36,913, giving him a net operating income of $151,989. He estimated land value at 10.13 acres at $70,000 an acre, or $709,100. Attributing a return of 11.41 percent to the land value, he arrived at a figure of $80,908 which he deducted from the net operating income. The balance of $71,081 he attributed to improvements. Capitalizing that figure at a rate of 13.41 percent, he arrived at a figure of $530,060 which, when added to the land value, resulted in a value under the income approach of $1,239,160. To this he added the value of the car wash under a cost approach *11 using an estimate of $61,992 and arrived at a total value indicated by the income approach of $1,301,152, or $1,300,000. The aforesaid capitalization rates were arrived at by using an 8.5 percent interest rate for both indebtedness and equity; an effective tax rate of $2.91; and a recapture rate of 2 percent on a 50 year building life.
For the taxable year 1977, defendant’s expert used the same approach with respect to the reproduction costs as he did in the prior year, with the exception that he valued the main building and office building at $24.00 a square foot and the car wash at $20.00 a square foot. The canopy and loading dock he valued at $55,000 and the macadam paving and exterior lighting at $225,-000. He arrived at a total reproduction cost new of $1,561,808, from which he subtracted physical and economic depreciation at a rate of 30 percent, or $468,542. He concluded that the depreciated improvement value, under the reproduction cost approach, was $1,093,265 for the building which, when added to the $760,000 attributable to the land, totalled $1,853,000.
With respect to the income approach utilized for the 1977 tax year, defendant’s expert took actual gross rents of $165,304 and deducted therefrom vacancy and rent loss of 5 percent. To the corresponding result he added tenant contributions of $32,300 to arrive at a total effective gross income of $189,339. From this he subtracted as expenses a management fee of 5 percent, actual salaries and payroll taxes, actual electric and gas expenses, actual insurance premiums, actual repairs and maintenance, and a miscellaneous deduction amounting to 2 percent of effective gross income. This gave him total expenses of $53,972, which gave him a net operating income of $135,367. Valuing the land at $75,000, or a total of $760,000, and attributing thereto a return of 11.47 percent, he arrived at a figure of $87,172, which he subtracted from net operating income and which left a figure of $48,195 as attributable to improvements. Capitalizing this figure at a rate of 13.47 percent, he arrived at a value of the improvements of $357,795 which, when added to the land value, gave him a value of $1,117,795. To this latter figure he added the cost approach value of the car wash of $64,288 and *12 came up with a total value indicated by the income approach of $1,182,000.
The capitalization rates for the taxable year 1977 were arrived at by adding an interest rate of 8.5 percent to an effective tax rate of 2.97 percent, arriving at a land capitalization rate of 11.47 percent. To this, a recapture rate of 2 percent was added, giving a building capitalization rate of 13.47 percent.
With respect to the taxable year 1978, under the reproduction cost approach, the defendant’s appraiser valued the subject land at $80,000 an acre, or $810,000. The main building was valued at $26.00 a square foot, the former Robert Hall building, which had been converted into a computer center for a savings and loan association, was valued at $30.00 a square foot, and the car wash was valued at $22.00 a square foot. The canopy and loading dock was valued at $60,000, and the macadam paving and exterior lighting was valued at $250,000. The above items resulted in a total reproduction cost new of $1,733,756. The depreciation, both physical and economic, was deemed to be 35 percent, or $606,815, leaving a depreciated improvement value of $1,126,941 which, when added to the land value, indicated a reproduction cost value of $1,937,000.
In utilizing the income approach with respect to the taxable year 1978, defendant’s appraiser utilized gross rents of $192,242 and subtracted therefrom a vacancy and rent loss of 5 percent, leaving an effective gross income of $182,630. To this he added tenant contributions of $50,180, arriving at a total effective gross income of $232,810. He deducted therefrom 5 percent management fees, electric and gas of $6,406, insurance of $7,380, repairs and maintenance of $38,783, a miscellaneous deduction amounting to 2 percent of the effective gross income or $4,656, and salary and Social Security Tax expenses of $7,500. This left a net operating income of $156,445. Using a land value of $80,000 an acre, or a total land value of $810,000, he utilized a capitalization rate of 11.37 percent to arrive at the net income attributable to the land in the amount of $92,097. The balance of $64,348 he deemed attributable to the improvements and *13 capitalized at a rate of 13.37 percent to produce an improvement value of $481,286. This latter figure, when added to the land value figure of $810,000, resulted in a value indicated by the income approach of $1,291,286. He then added the value of the car wash building, using the cost approach, in the amount of $65,665 to come to a total value, by the income approach, of $1,357,000. The aforesaid capitalization rate for 1978 was arrived at by adding an 8.5 percent interest rate to an effective tax rate of $2.87. A 2 percent recapture rate was used for the buildings.
In reviewing the undisputed facts in this case and analyzing testimony and valuation reports of the respective experts who testified, I find that I cannot completely agree with either of the valuation experts. Accordingly, I shall utilize those undisputed facts, together with those portions of the respective testimony and opinions of the two experts which are most convincing, in order to reach a value for each year. See Samuel Hird and Sons, Inc., v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div. 1965).
I agree with both experts that the greatest emphasis should be upon the economic analysis approach rather than the cost analysis approach. See, however, New Brunswick v. State of N.J. Div. of Tax Appeals, 39 N.J. 537, 551, 189 A.2d 702 (1963):
“.. . although capitalization of income is an acceptable approach, it is beset with so many debatable incidents that it should not lightly be accepted as the single solvent of a quarrel over assessment. Generally it is well to measure its results against other known data and the common sense of the situation.”
Further, I agree that the cost analysis approach utilized by plaintiff’s expert, in relying on the real property appraisal manual for New Jersey assessors, to be more reliable than the generalized approach utilized by defendant’s expert. However, the $50,000 an acre value which plaintiff’s appraiser utilized was unsupported, either through the one comparable to which he testified or the comparables utilized by defendant’s expert. Defendant’s expert detailed five specific land sales in the taxing district during the period February 1974 to January 1979. With *14 those as a basis, he testified that the subject land had a value of $70,000, $75,000 and $80,000 an acre for tax years 1976,1977 and 1978, respectively.
In reviewing the aforesaid land sales as well as the testimony of both experts, I find that the subject land values were $60,000, $60,000 and $65,000 an acre for tax years 1976, 1977 and 1978, respectively.
With respect to the mall building, as of October 1, 1975, on the basis of the aforesaid appraisal manual, the replacement value as of October 1, 1975, is computed at $880,728. However, while physical depreciation of 20 percent would be appropriate, an additional functional/economic depreciation of 55 percent, or a total of 64 percent physical, functional/economic depreciation is not justified in this matter. While the evidence clearly shows that the desired primary supermarket tenant was not available during this period, the satellite stores were fully rented and the potential was always there. With full recognition of the strong competition from large supermarkets within the area of one mile, there was a functional/economic depreciation of 35 percent which, when added to the physical depreciation of 20 percent, gave a total depreciation of 55 percent. On the same basis, the Robert Hall Building is deemed to have been similarly depreciated for computing a valuation by use of the cost analysis method. With an additional 2 percent cumulative addition for the years 1977 and 1978, I find the same depreciation approach for all years.
Plaintiff’s expert further testified that the on-site improvements were valued at approximately 25 percent of their replacement value, due to the deteriorated condition of the asphalt paving. In this respect, he emphasized the deterioration of the asphalt paving without taking into consideration the curbing or the pole mounted lighting fixtures in the parking area. As he placed a value of $50,000 on such on-site improvements on the basis of a 75 percent depreciation from replacement costs, it is apparent that he utilized a $200,000 figure to arrive at replacement cost. This is the same figure which defendant’s expert *15 utilized as of October 1, 1975. However, defendant’s expert utilized a physical and economic depreciation of 25 percent. Based upon the facts and testimony, it is found that the on-site improvements were depreciated to the extent of 50 percent and, therefore, as of October 1,1975, should be given a present value, under the cost approach, of $100,000. I have reduced the $100,000 figure for the two subsequent years by $10,000 per year, recognizing increased reproduction costs with offsetting physical depreciation.
In valuing the car wash under the cost approach, plaintiff’s appraisal expert testified that he used the same approach that he used in valuing the other structures. His values for the car wash were $26,400, $27,600 and $28,200 for the respective years 1976,1977 and 1978. Utilizing the obsolescence and physical depreciation approach of plaintiff’s expert, it is obvious that he utilized a reproduction cost for the structure of $73,333, $78,706 and $82,466, respectively. Accordingly, I have utilized those figures with offsetting physical and economic depreciation. I have utilized the same physical depreciation that the plaintiff’s expert has utilized, i. e., 2 percent a year. However, the economic obsolescence of the car wash is obviously one that would not be treated in the same manner as the economic obsolescence of the retail stores which lacked a major supermarket. While a car wash would undoubtedly have benefited from maximum utilization of the retail stores, a car wash, by its very nature, can be attractive in and of its own right. This is particularly so where there is an adequate amount of parking space surrounding the car wash. Accordingly, the economic obsolescence attributable to the car wash is limited to 20 percent. I find that the functional obsolescence was de minimus. Utilizing the aforesaid values, reduced by the total of the physical and economic depreciation, leaves a reproductive cost for the car wash, as of the taxable years 1976,1977 and 1978, of $44,000, $45,649 and $46,181, respectively.
Utilizing all the aforesaid values and rates, I find the reproductive costs to be as follows:
*16 1976
Reproductive Cost Approach
Land: 10.13 acres at $60,000 $ 607,800
Mall Building $ 880,728
Robert Hall Bldg. 163,134
$1,043,862 - (55% x 1,043,862) = 469,738
On-site Improvements 200,000 - (50% x 200,000) = 100,000
Car Wash 44,000
Reproductive Cost........................$1,221,538
1977
Reproductive Cost Approach
Land: 10.13 acres at $60,000 $ 607,800
Mall Building $ 945,250
Robert Hall Bldg. 175,085
$1,120,335 - (57% x 1,120,335) = 481,744
On-site Improvements 200,000 - (55% x 200,000) = 90,000
Car Wash 45,649
Reproductive Cost........................$1,225,193
1978
Reproductive Cost Approach
Land: 10.13 acres at $65,000 $ 658,450
Mall Bldg. $ 990,416
Robert Hall Bldg. 183,451
$1,173,867 - (59% x 1,173,867) = 481,285
On-site Improvements 200,000 - (60% x 200,000) = 80,000
Car Wash 46,181
Reproductive Cost........................$1,265,916
*17 In reaching a value under the economic analysis approach, plaintiff’s expert utilized rents, maintenance participation, tax participation and overages and telephone commissions to arrive at gross income. He then utilized this figure in computing his percentage reductions for vacancy and credit loss, management, and reserves for replacement. The defendant’s expert, however, utilized only the rents to compute his percentage deductions with respect to the aforesaid items. I find that the rents, maintenance participation and tax participation should be included in the figure to which the percentage is applied. However, overages and telephone commissions should not be so included.
Both experts used a 5 percent vacancy and credit loss and a 5 percent management fee. Also, with respect to all years, both experts utilized actual salary and payroll taxes, utility expenses, insurance and repairs and maintenance. However, with respect to the taxable year 1976, defendant’s expert used a figure of $7,890 for repairs and maintenance as opposed to plaintiff’s appraisal expert’s utilization of the figure of $22,983. The latter figure is consistent with the repairs and maintenance for the next two years and, under these circumstances, I find the plaintiff’s figures to be the accurate figures. Plaintiff’s expert used a reserve for replacement of 2 percent as opposed to defendant’s utilization of the 2 percent for miscellaneous. I find plaintiff’s approach to be the more acceptable one. Plaintiff’s expert utilized legal and accounting expenses in the amounts of $3,554, $9,081, and $390 for the taxable years 1976, 1977 and 1978, respectively. When questioned by the Court with respect to the large legal and accounting expense with respect to the taxable year 1977, plaintiff’s manager testified that the legal and accounting expense in the amount of $9,081 for the taxable year encompassed expenditures for legal and accounting services in the preparation of the contracts and review of the income and expenses in the purchase of the one-half interest of the subject property. It should be noted that the actual expenses utilized by the experts were for fiscal years ending June 30 of each of the taxable years. The contract for the sale of the one-half *18 interest to the Galesis was dated July 2, 1976, and the closing took place on August 25,1976, as of June 30,1976. The detail of the contractual agreement clearly indicates that it was the subject of discussion and review prior to its signing in July. Further, with respect to accounting, the management fee of 5 percent, which has been allowed by both experts, should encompass a large amount of the accounting expenses necessary for the operation of the business. While defendant’s expert did not allow any legal or accounting expense in concluding a value under the economic analysis approach, I have found that an economic amount of $500 a year for the years 1976 and 1977 and the actual amount of $390 for the taxable year 1978 is appropriate. With respect to the taxable year 1978, plaintiff’s expert utilized figures of $3,630 for refuse collection, $1,200 for security, $17,877 for commissions and miscellaneous of $2,000. Defendant’s expert had allowed a miscellaneous expense of 2 percent which was normally utilized by plaintiff’s expert. I have allowed the refuse collection expense in view of the testimony of plaintiff’s manager. With respect to security, the advent of the computer center in the former Robert Hall building could well justify additional security expenses. In this respect, plaintiff’s manager testified that security was a problem, and I am accordingly allowing the security expense of $1,200. As to the commissions claimed amounting to $17,877, plaintiff’s manager testified that approximately $16,500 of this-amount was attributable to the lease obtained in renting the Robert Hall building. That lease was for a period of 15 years, with the tenant having the option to terminate at the end of 10 years. An appropriate commission for the purposes of the economic approach would be one-tenth of the $16,500, or $1,650. Accordingly, commission expenses have been reduced to $3,027.
In attempting to value the subject property by utilizing the economic approach method, neither expert utilized the actual income realized by the car wash. As previously mentioned, the car wash building was owned by a tenant of the subject taxpayer and was located on land leased from the subject taxpayer. The rents paid for the lease of the land were included in the *19 income of the taxpayer. In attempting to rectify the omission of the income realized by the car wash operation, both experts added the value of the building, under the cost approach method, in arriving at a total value of the property under the economic approach method.
In so doing, both parties recognize that what is being valued for tax purposes is the land plus all improvements, whether or not the taxpayer is the owner of the improvements. See West Jersey Grove Camp Association v. Vineland, 80 N.J. Super. 361, 193 A.2d 785 (App.Div.1963).
The utilization of the cost approach in attempting to value under the economic approach method is far from satisfactory. Neither party availed themselves of the opportunity which they had, under the law, to obtain the income realized by the car wash owner. However, as both parties utilized the aforesaid approach, I shall adopt said method for the purposes of this case. Accordingly, those amounts which I have previously found to be the reproductive costs of the car wash for the purposes of the cost approach, shall be included in the total figure for the purposes of determining a value utilizing the economic approach.
In determining the capitalization rate to be utilized in the economic approach, plaintiff’s expert assumed a 75 percent mortgage and a 25 percent equity. For the taxable years 1976 and 1977, he assumed a mortgage interest rate of 9 percent; and for 1978 he assumed a mortgage interest rate of 9.5 percent. In all years he assumed a return on equity of 12 percent. To the resultant base rate he added the tax rate for each year and, with respect to the buildings, utilized a 40 year remaining economic life, or a 2.5 percent recapture. Defendant’s expert utilized a rate of 8.5 percent for both debt and equity. He utilized the effective tax rate for each year and allowed a recapture rate of 2 percent with respect to the buildings. I find that the appropriate methodology to be utilized in computing a capitalization rate should be the assumption that financing will be available for 75 percent of the purchase price at a rate of 8.5 percent for *20 the years 1976 and 1977, and at a rate of 9 percent for 1978. Further, a return on equity should be 12 percent for all years, and the building capitalization rate should be computed on the basis of a 40 year life, or 2.5 percent.
As there is no discrimination issue for the years 1976 and 1977, the value conclusions herein found for those years will be subject to the full tax rate. Therefore, the effective tax rate used in the capitalization rate will be the actual tax rate. See New Brunswick v. State of N.J. Div. of Tax Appeals, supra, at 39 N.J. p. 547, 189 A.2d 702.
As to the tax year 1978, the capitalization rate will include the tax rate as adjusted by the Director’s average ratio for the purpose of applying Chapter 123, Laws of 1973, as amended. That tax rate will be 2.91 percent or 92 percent of the actual tax rate of $3.16. The applicability of the Director’s average ratio to the tax year 1978 is hereinafter detailed.
Utilizing the above, I find the capitalization rates to be as follows:
Capitalization Rate 1976
Mortgage 8.5% x .75 = 6.375%
Equity 12% x .25 = 3.00
9.375%
Actual Tax Rate 3.04
Land Capitalization Rate 12.415%
Building at 40 year life 2,50
Building Capitalization Rate 14.915%
Capitalization Rate 1977
Mortgage 8.5% x .75 = 6.375%
Equity 12% x .25 = 3.00
9.375%
Actual Tax Rate 3.22
Land Capitalization Rate 12.595%
Building at 40 year life 2,50
Building Capitalization Rate 15.095%
*21 Capitalization Rate 1978
Mortgage 9% x .75 = 6.75%
Equity 12% x .25 = 3.00
9.75%
Effective Tax Rate 2,91
Land Capitalization Rate 12.66%
Building at 40 year life 2.5
Building Capitalization Rate 15.16%
Utilizing the aforesaid capitalization rates and the adjustments to income and expenses as previously discussed, the economic approach to value gives the following results:
1976
Economic Approach
Rent $ 165,180
Maintenance Participation 10,808
Tax Participation 16,594 $ 192,582
LESS: Vacancy & Credit Loss of 5 Percent (9,629)
$ 182,953
Overages and Telephone Commissions 4,579
Effective Gross Income $ 187,532
Expenses:
Management (5%) $ 9,148
Utilities (Actual) 6,823
Payroll (Actual) &
Payroll Taxes (Actual) 6,045
Insurance (Actual) 2,932
Repairs & Maintenance (Actual) 22,983
Legal & Accounting (Economic) 500
Reserve for Replacements (2%) 3,659
$52,090 $ 52,090
Net Income $ 135,442
Land: $607,800 x 12.415% (75,458)
$ 59,984
$59,984 - 14.915% $ 402,172 Bldg Value
607,800 Land Value
ADD: Car Wash 44,000
TOTAL ... $1,053,972
*22 1977
Economic Approach
Rent $ 165,304
Maintenance Participation 13,341
Tax Participation 14,823
$ 193,468
LESS: Vacancy & Credit Loss of 5 Percent (9,673)
Overages and Telephone Commissions $ 183,795 4,135
Effective Gross Income $ 187,930
Expenses:
Management (5%) $ 9,190
Utilities (Actual) 7,518
Payroll 6,218
Payroll Taxes 2,413
Insurance 3,350
Repairs & Maintenance 21,217
Legal & Accounting Pees 500
Reserve for Replacements (2%) 3,676
$54,082 $ 54,082
Net Income $ 133,848
Land: $607,800 x 12.595% (76,552) $ 57,296
Building: $57,296 h- 15.095% $ 379,569
Land 607,800
ADD: Car Wash 45,649
TOTAL $1,033,018
1978
Economic Approach
Rents $ 187,371
Maintenance Participation 22,641
Tax Participation 20,556
$ 230,568
LESS: Vacancy & Credit Loss of 5 Percent (11,528)
Overages and Telephone Commissions _618
$ 219,040
Effective Gross Income $ 219,658
*23 1978
Economic Approach
Expenses:
Management (5%) $10,952
Utilities (Actual) 6,091
Payroll & Payroll Taxes (Actual) 7,733
Insurance (Actual) 5,695
Repairs & Maintenance (Actual) 21,755
Legal & Accounting Pees (Actual) 390
Refuse Collection (Actual) 3,630
Security (Actual) 1,200
Commissions 3,027
Reserve for Replacements (2%) 4,381
$64,854 $ 64,854
Net Income $ 154,804
Land: $658,450 x 12.669% (83,360)
$ 71,444
Building: $71,444 -*• 15.16% $ 471,266
Land 658,450
ADD: Car Wash Building 46,181
TOTAL .. . $1,175,897
The result of the above tables produces values under the two different approaches as follows:
VALUES
Cost Approach Income Approach
1976 $1,221,538 $1,053,972
1977 $1,225,193 $1,033,018
1978 $1,265,916 $1,175,897
It is fully appreciated that plaintiff sold one half of its interest in the subject property as of June 30, 1976, for $175,000 together with the assumption of one half of the balances due under the mortgages covering the property. It must be realized that plaintiff’s interest in the subject property is less than that *24 which is the subject of taxation. It did not own the car wash building which was located on the property and which is the subject of a long term lease. This could have had an adverse effect upon the value of plaintiff’s interest in the property.
For local property tax purposes, it is well established that what is required by law is an assessment of the true value of the property, not the value of the owner’s title. See Stack v. Hoboken, 45 N.J.Super. 294, 132 A.2d 314 (App.Div.1957); Town of Secaucus v. Damsil, Inc., 120 N.J.Super. 470, 295 A.2d 8 (App.Div.1972) certif. den. 62 N.J. 90, 299 A.2d 80 (1972); In re Appeal of Neptune Tp., 86 N.J.Super. 492, 207 A.2d 330 (App. Div.1965).
I find, consistent with the testimony of both plaintiff’s and defendant’s experts, that in placing the greatest emphasis on the economic approach, the true values of the property as of the taxable years were as follows: 1976, $1,065,000; 1977, $1,065,-000; 1978, $1,180,000.
The average ratio of assessments to true value for the taxing district of Wayne for the purpose of applying Chapter 123, Laws of 1973, as amended, which became effective with the tax year 1978 as N.J.S.A. 54:2-^40.4, was 92 percent. The ratio of assessment to true value of subject property for that year was 102 percent. Accordingly, as the average ratio is below the County level of 100 percent and the ratio of the assessed value to true value exceeds the County level, the taxable value will be computed by applying the average ratio to the true value. See N.J.S.A. 54:2 — 40.4c.
The Clerk of the Tax Court will enter a judgment as follows:
Year Land Improvements Total
1976 $607,800 $457,200 $1,065,000
1977 $607,800 $457,200 $1,065,000
1978 $605,774 $479,826 $1,085,600