CITY OF NEW BRUNSWICK, NEW JERSEY, APPELLANT, v. STATE OF NEW JERSEY DIVISION OF TAX APPEALS, DEPARTMENT OF THE TREASURY AND NATIONAL SHOE SALES, INC., RESPONDENTS.

(1959 Tax)

CITY OF NEW BRUNSWICK, NEW JERSEY, APPELLANT, v. STATE OF NEW JERSEY DIVISION OF TAX APPEALS, DEPARTMENT OF THE TREASURY AND NATIONAL SHOE SALES, INC., RESPONDENTS.

Argued February 4, 1963—Decided April 2, 1963.

*Mr. Frederick F. Richardson* argued the cause for appellant and cross-respondent.

*Mr. Lawrence L. Lasser* argued the cause for respondent and cross-appellant National Shoe Sales, Inc. (*Messrs. Kristeller, Zucker, Lowenstein and Cohen,* attorneys; *Messrs. Lasser and Lasser,* of counsel; *Mr. B. William Hochman,* on the brief).

*Mr. Arthur J. Sills,* Attorney General of New Jersey, filed a statement in lieu of brief on behalf of respondent Division of Tax Appeals (*Mr. Alan B. Handler,* Deputy Attorney General, of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. These cases involve tax assessments for 1958 and 1959 of a parcel of commercial property, 354 George Street, in the City of New Brunswick. Both the City and the taxpayer appealed from the judgments of the Division of

Tax Appeals, and we certified the matters before they were argued in the Appellate Division.

The issues are whether the Division erred in its findings of (1) full value and (2) the "common level" of assessments in the City, to which it reduced the full valuation of the property. We will consider the second issue first.

## I.

It appears without question that real property in the City was not assessed for either year at full true value or any uniform percentage of it. The taxpayer sought a reduction to the "common level" under *In re Appeals of Kents* 2124 *Atlantic Ave., Inc.*, 34 *N. J.* 21 (1961). The Division found the common level to be 33–1/3% of full value and granted relief on that basis.

The City contends there was no common level. There was none, in the sense of a single level consciously applied by the assessor to all real property. Rather the rolls with their diverse treatment of property were repeated from year to year without appraisal. The assessor testified that the assessments in the neighborhood of the property here involved were understood by him to be at 43% of full value. The available sales data indicates the average ratio for all real property to be 33.39% for 1958 and 30.05 for 1959. We are satisfied the showing warranted relief under *Kents*.

The Division used 33–1/3% for each year. The taxpayer complains that the Division did not use 30% for 1959 in accordance with the average ratio as found by the State Director of Taxation. We think the Division's finding was sound. As a practical matter there must be a large measure of stability in the assessment of property, *Switz v. Township of Middletown*, 23 *N. J.* 580, 596 (1957); *Hackensack Water Co. v. Division of Tax Appeals*, 2 *N. J.* 157, 163 (1949), and hence the common level should not fluctuate from year to year. We noted in *Kents* that in the use of the average ratio (34 *N. J.*, at *p.* 31):

"* * * The trier of the facts may properly consider any weakness which may appear, as, for example, a paucity of sales in the municipality concerned or some imbalance caused by unusual experience. To that end, *consideration may be given to the average ratio of other years* and to such appraisals of properties as the trier of the facts may feel to be necessary to assure that the average ratio is not grossly deceptive as a fair gauge of the ratio of assessment to market value." (Emphasis added.)

And the Division correctly held that the reduction should be to the common level of all real property rather than to the level of commercial property alone. *Siegal v. City of Newark,* 38 *N. J.* 57 (1962).

## II.

The remaining question concerns the valuation of the property. The property is "100 percent" commercial property and consists of a plot 30 feet by 156 feet with a two-story brick store building with basement.

The taxpayer leased the property to a retail shoe company for the period May 1, 1941 to April 30, 1962 at a net rental, after taxes, of $8,000 per year plus 6% of sales in excess of a stipulated figure. The record indicates that no additional rent was paid under the percentage provision, at least after 1957. On March 8, 1960 (this of course was long after the assessment dates here involved), the parties extended the lease to April 30, 1967, reducing the fixed annual rent from $8,000 to $6,000, effective as of May 1, 1960.

For each of the years in question, the property was assessed at $93,450, of which $50,450 was for land and $43,000 for building. The assessor testified, as we mentioned above, that he understood the assessments to be at 43% of full value. He said also that these assessments are consistent with the others in the neighborhood, land in this immediate area being valued at $3,500 per front foot and the land in question at $3,800 per foot because of its extra depth.

Each side relied upon one expert. The expert for the taxpayer reached the figure $111,700 for 1958, of which he allocated $79,600 to land and $32,100 for improvement. For the

year 1959 his total figure was $107,000. These values were reached by capitalization of net income. In support of that approach the witness said the property is particularly suited for investment purposes and to an investor it is the expected flow of income which controls the price he will pay. The allocations between land and building were made by valuing land at $2,600 per front foot for 1958 and $2,500 per front foot for 1959, the residue being attributed to building.

The City's expert used both the reproduction approach and the income approach. As to reproduction, he took land at $3,800 per front foot (the same figure the assessor says was in fact used), for a total of $114,000. The building, less 15% depreciation, was valued at $95,600, making a total valuation of $209,600. On the income approach, the witness found a fair gross rental would be $19,800, from which he deducted 10% for vacancy, leaving $17,800 from which he deducted 40% ($7,100) for all expenses, including taxes. There remained net income of $10,700, which, capitalized at 5%, yielded $214,000. The witness, using his reproduction figure, said the "warranted" assessment (*i. e.*, at 42.5% of full value) would be $89,100, allocable $48,450 to land and $40,650 to building.

The Division found that "Such property is usually purchased and sold not on the basis of reproduction value or on the basis of comparable sales but on the basis of yield to the investor." It emphasized the property was leased for a long term to a "national corporation of recognized ability to meet the terms of the lease." It thereupon took the actual net rental payable, $8,000, and applied 5%, the capitalization rate advocated by the City's expert, for a total valuation of $160,000. Of this $100,000 was allocated to land and $60,000 to building.

■ The search, of course, is for the fair value of the property, the price a willing buyer would pay a willing seller. Consideration may be given to cost less depreciation and sales of comparable property. It may also be given to rental income. *Aetna Life Insurance Co. v. City of Newark*, 10 *N. J.*

99, 106 (1952); *Appeal of Pennsylvania Railroad Co.,* 20 *N. J.* 398, 412 (1956); Annot., 95 *A. L. R.* 442 (1935). There can be no rigid rule. The answer depends upon the particular facts and the reaction to them of experts steeped in the history and hopes of the area.

In a given case capitalization of income may predominate in the expert's opinion. The Division so viewed the present matter, as it properly could on the evidence before it. But the problems to which we will now refer suggest the care with which the income method must be used and indicate as well that one should hesitate to accept its answer without checking against all available data.

## A.

██ The first problem is to find the fair rental value to which the capitalization rate will be applied. The taxpayer uses the $8,000 figure contained in its own lease. The City contends for $10,700, which its expert reached by starting with a hypothetical gross rental value of $19,800 less a vacancy factor of 10% and less 40% for all expenses including taxes. No doubt the fair rental value, rather than the actual rent payable under an existing lease, must control. *Somers v. City of Meriden,* 119 *Conn.* 5, 174 *A.* 184, 186–187, 95 *A. L. R.* 434 (*Sup. Ct. Err.* 1934), annotated 95 *A. L. R.* 442 (1935); *People ex rel. Gale v. Tax Comm'n of City of New York,* 17 *A. D.* 2d 225, 233 *N. Y. S.* 2d 501, 506–507 (*1st Dept.* 1962). True, the value of a parcel of property may in fact be affected by the prudence or imprudence of its owner, and so a long-term lease for an unfavorable rent will impair the selling price, just as a long-term lease to a triple-A tenant at a high rental may make the property more attractive to a buyer. But the valuations of properties for local taxation cannot vary with the managerial successes or failure of the owners. Adjacent properties of equal potential cannot be assessed differently because one proprietor was more or less astute than the other.

The expert for the taxpayer claimed the rent actually payable under the lease was in line with rents payable for comparable property. He accordingly used the contract rent of $8,000 per year. Prior to trial he had valued the property at $133,000 upon that basis. At the trial, however, his figure for 1958 was $111,700 and for 1959 was $107,000. The reason was that he took account of ensuing events, including the reduction in rent which the parties negotiated long after the assessing dates here involved. As to this modification, the Division correctly held that the valuation, although based upon a forecast of earnings, must be found upon what was known and anticipated as of the assessing date, unaided by hindsight.

The City's expert also claimed rentals paid for comparable properties supported his net figure of $10,700. He, however, had lost his notes and was unable to supply specific references.

In accepting the $8,000 figure, the Division said of the City's expert that "apparently through misinformation or some theoretical approach which had no justification in fact, he added $2,000 to the present rental." The City complains the Division must have forgotten its expert's testimony as to how he arrived at $10,700. That possibility seems remote despite its compatibility with the language we have quoted. Rather we think the Division simply rejected an estimate of net rental value which the witness could not bolster by citation of rents elsewhere. Moreover, in reaching the net figure of $10,700, the City's expert allowed $7,100 for all expenses including taxes. Since taxes amounted to $6,900, these calculations left but $200 for all other expenses, and the reduction in assessment which the witness's testimony would permit would not have enlarged that figure by more than a few hundred dollars.

### B.

The next question is whether income should be capitalized *before* or *after* taxes. Both experts, and the Division

as well, used income after deducting taxes. This, we think, was erroneous.

An actual investor who accepts the existing tax treatment may for his own purposes capitalize income after taxes. But when the issue is the valuation of the property *for taxation,* the amount of the taxes, depending as they do upon the very answer which is sought, cannot be accorded a role in reaching it. The greater the tax load, the more egregious is that error, and so it is in a State such as ours in which real property is burdened with so large a share of the cost of government.

Let us illustrate. We are told the tax bill in each year was $6,900. The Division capitalized the net income of $8,000 at the rate of 5%, resulting in the figure of $160,000. Applying a common level of 33–1/3%, it arrived at an assessment of $53,334. This represents, in round figures, a reduction of $40,000 in assessed valuation, and at $7.39 per $100, which we are told was the tax rate in the years in question, means a reduction in each year of about $2,900 in tax dollars. Since the gross rent, presumably at least, represents what a tenant would willingly pay, the reduction here ordered by the Division would increase the net rental value of $8,000 by the tax dollars saved, for a total of $10,900. If that figure is then capitalized at 5%, the result is a valuation of $218,000, rather than the figure of $160,000 which the Division had found and upon the basis of which it reduced the assessment.

■ At the argument we invited supplemental memoranda with respect to this problem and in response the taxpayer correctly suggested that net income must be capitalized *before* taxes, with the capitalization rate increased to yield the return the investor expects plus the amount of local taxes payable. See 1 *Bonbright, Valuation of Property, pp.* 257–58 (1937) ; *cf. Aetna Life Insurance Co. v. City of Newark, supra* (10 *N. J.,* at *p.* 107).

To pursue that approach, we must ascertain what would be the local tax rate if the property were assessed at full value, since it is that figure which must be included in the capitalization rate. Here the inquiry involves the same search for

the "common level" of assessments which we discussed in "I" above. The Division, in the latter connection, found the common level to be 33–1/3% for both years. For the immediate purposes of capitalization of income, the taxpayer in its supplemental memorandum asks that we use 33–1/3%, and applying it to the tax rate of $7.39, arrives at the figure of 2.46 which its rounds to 2.50 as the tax rate at full value. Accepting this step, we must add 2.50 to the capitalization rate.

If we add 2.50 to the 5% rate used by the Division and apply the total of 7.5% to a net income of $14,900 ($8,000 plus $6,900), the resulting value is $198,666. And if we use the income figure of the City's expert, $10,700, and add taxes of $6,900 for a total of $17,600, and apply the rate of 7.5%, the valuation becomes $234,666.

The dramatic effect of the error in using net income *after* taxes is thus apparent. The capitalization rate, including a factor for taxes, must be applied to net income before taxes. And, as we mentioned, this involves finding the tax rate upon full true value, or making an approximation of it, good enough for the purposes of the formula with an eye nonetheless to the large impact of a small error.

## C.

The Division declined to consider future physical depreciation and of this the taxpayer complains. If the approach is reproduction cost, a deduction is made for *past* depreciation but depreciation to come plays no part. The reason is that the tax is payable upon the basis of present worth. When, however, the method of valuation is the capitalization of income, future depreciation theoretically is relevant, since the thesis is that the investor pays a sum which will yield a given rate of earnings and obviously that rate of earnings would be diminished if the capital investment is simultaneously eroded. Hence if future depreciation is something an investor would *in fact* consider in fixing the price he

would pay for the property in question, such depreciation is simply one of the operative facts of the market place which may not be ignored.

The Division did not deny the relevancy of future physical depreciation upon the income approach. Rather it found as a fact that a purchaser of this property would ignore the subject. The reason given is that the structure "is a brick building of ordinary oblong construction which has been standard for a long time and is dictated by the size of the lot."

We gather the City's expert thought depreciation was not a real factor. The taxpayer's expert thought it was, but we confess our difficulty in finding from his testimony just how he allowed for it. In his approach he valued the rents for the balance of the lease by using "Inwood's Coefficient" and then added a valuation of the "reversion" after the termination of the lease as extended. As we understand the Inwood method, it will yield the sum one would pay for the right to receive periodic payments which in total will return the sum paid together with the rate of earnings thereon which the investor expects. It thus appears to contemplate the amortization in full of the cost of the purchase. We could follow that approach if the issue were the present value of the net rents payable under a lease, but the record does not tell us how that step advances the valuation of the entire fee. Perhaps the reason is that we do not understand how the value of the reversion was found. The taxpayer's expert states the value of the reversion is $100,000, to which he applied the Inwood factor of 6% interest deferred for the remaining years of the lease. But we are not told how he reached the figure of $100,000, nor exactly what is accomplished by applying the Inwood factor to it. It would be helpful, upon the retrial we find necessary, for the expert to expound his thesis in sufficient depth to inform strangers to it.

At any rate, the taxpayer's expert, noting "this Inwood method is somewhat confusing," then approached the valuation by capitalizing $8,000 at a 6% return plus 1% for de-

preciation. The Division commented that upon that basis "the depreciation would be fabulous."

There are a number of problems with respect to depreciation as to which the experts probably could aid us, although Professor Bonbright warns that "no single formula for estimating depreciation is free from serious error, save in a few selected instances." 1 *Bonbright, Valuation of Property* 203 (1937).

We note first that the taxpayer's expert treated depreciation, not as a deduction from gross income, but as a factor in the capitalization rate. The subject has been handled both ways. See *In re New York Title & Mortgage Co.,* 21 *N. Y. S. 2d* 575, 595 (*Sup. Ct.* 1940), and compare testimony in *Newark & Essex Building Corp. v. City of Newark,* 132 *N. J. L.* 574, 575 (*Sup. Ct.* 1945), with testimony in *City Holding Co. v. Board of Tax Appeals,* 127 *N. J. L.* 168, 169–170 (*Sup. Ct.* 1941). It seems to us that since depreciation, like taxes, depends upon the very issue, *i. e.,* the valuation of the property, it cannot be treated as a deduction from income.

If physical depreciation is to be reflected in the capitalization rate, then since such depreciation relates solely to the improvement, the capitalization rate should be increased only with respect to so much of the net income as is allocable to improvement as distinguished from land. That would require a predetermination of the relative value of one to the other, and we assume that, to do so, resort must be had to the reproduction method as to building or to comparable sales as to land, even though, by hypothesis, the total valuation of both would not interest the buyer.

Here the taxpayer's expert ultimately allocated to building something less than 30% of his total valuation. We get the impression that he started with the premise that the life of the building was 50 years, so that the annual rate, straight line, would be 2%. But if 1% is added to the capitalization rate to be applied to *all* of the income, the effect is to use a depreciation rate in excess of 3% upon the building upon the

witness's own relative valuations of land and building. If he correctly allocated 30% to building, the process which led to that allocation ought to permit an allocation of 30% of income to building to the end that a factor for depreciation could be confined to the capitalization rate applied to the income so allocated. Further, if the building is new, it may be correct to use an annual rate determined upon the straight-line approach for the full life expectancy. But if the building is not new (we know the building here involved was erected sometime prior to 1941), much of its life expectancy may have been spent. Thus the rate should be one which would capture only the remaining depreciable value within the number of years that are left.

And lastly there is the question whether the straight-line method of depreciation used by the taxpayer's expert is preferable to competing approaches to the problem. See *Burritt Mutual Savings Bank of New Britain v. City of New Britain,* 146 *Conn.* 669, 154 *A. 2d* 608, 613 (*Sup. Ct. Err.* 1959); *McMichael, Appraising Manual* 54 (*4th ed.* 1951).

### D.

Finally we come to the rate of earnings the purchaser would expect. The taxpayer's expert found it to be 6% for the year 1958. He said that on the assessing date money could have been borrowed at 5% interest on a mortgage for two-thirds of the total value of the property, and since an investor would want 8% on his own outlay, a 6% return would be needed on the total purchase price. With respect to 1959, the witness increased the rate to 6½ because mortgage money was more costly on the assessing date for that year. We note in passing that the assessment process cannot be so acutely sensitive to such changes. It is not feasible for an assessor to adjust the rolls to the fluctuations of the mortgage market. The rate of return should reflect conditions for a reasonable span of years. It must be remembered that valuation for taxation cannot be dollar precise.

The City's expert thought 5% would suffice, and with this the Division agreed.

The rate of return, the most significant factor in the capitalization process, is difficult to find. 1 *Bonbright, Valuation of Property* 266 (1937) (noting the element of "guesswork" involved) ; 1 *Orgel, Valuation under Eminent Domain* § 187, *p.* 721 (*2d ed.* 1953). Yet a small difference has a large impact. As one witness said, the difference between a 4% rate and a 6% rate is not 2%; it is 50%.

A court cannot assume the correct answer will be had merely by adding some factor to what would be charged for a well secured loan, for while it is true that there is little risk in such a loan, it is equally true that there is no hedge against a shrinking dollar or opportunity for gain in a rising market. Moreover, the owner obtains a deduction for depreciation on his income tax return which the mortgage lender does not, and hence the apparent return is increased in real value. In any event, it is not for the trier of facts to decide abstractly what return an investor should want; the inquiry relates to what investors in property of this kind *in fact* do demand and do obtain in deals with willing sellers.

### III.

From the above, it is readily concluded that although capitalization of income is an acceptable approach, it is beset with so many debatable incidents that it should not lightly be accepted as the single solvent of a quarrel over assessment. Generally it is well to measure its results against other known data and the common sense of the situation.

As we noted earlier, it was clearly wrong to capitalize the net rental *after* taxes. We might accept all the findings expressed or implicit in the Division's judgment and make the adjustment required by capitalization *before* taxes. We are reluctant to do so. The matter is important to the taxpayer. It is important to the City since the determination here, although not technically binding with respect to other property,

could influence the assessment of its most valuable commercial real estate. We are not satisfied the Division received all the aid it ought to have in the light of the problems to which we have referred. Hence we remand the matters to the Division for retrial upon the issue of valuation. The finding as to the "common level" is affirmed. No costs.

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.