HELLER CONSTRUCTION COMPANY, PLAINTIFF, v. CITY
OF NEWARK, DEFENDANT.

Tax Court of New Jersey

August 6, 1980.

*Mandelbaum & Mandelbaum* for plaintiff (*Michael Smoller*, appearing).

*Melvin Simon*, Asst. Corporation Counsel, City of Newark, appearing for defendant.

HOPKINS, J. T. C.

The subject case involves appeals and cross–appeals from judgments of the Essex County Board of Taxation with respect to property located at 910–920 18th Avenue in the City of Newark and designated as Block 4041A, Lot 3, on the tax maps of said taxing district.

The original assessments and County Board judgments are as follows:

1975 through 1978:

|  | Original Assessment | County Board Judgment |
|---|---|---|
| Land ........... | $20,000 | $20,000 |
| Building ......... | 36,800 | 29,300 |
| Total ........... | $56,800 | $49,300 |

The taxing district's position is that the original assessments were correct. The taxpayer's position is that the assessments for the years involved should total as follows:

| 1975 | .......................... | $35,600 |
|---|---|---|
| 1976 | .......................... | $36,000 |
| 1977 | .......................... | $33,200 |
| 1978 | .......................... | $31,700 |

The parties have agreed that the correct assessed values should be obtained by applying the Director's ratios to the true values as herein found.

The subject property is a one story brick building containing approximately 9,200 square feet, no basement, irregular plot of approximately 135 foot frontage on 18th Avenue between Carolina Avenue and Melrose Avenue. A portion of the lot, approximately 39 feet in width, extends to and fronts on Carolina Avenue. The tax lot has an area of 15,004 feet, of which 13,164 feet were leased to Acme Markets, Inc., a supermarket, during the period August 1972 to August 1977. Said tenant leased that portion of the subject premises, together with an adjacent lot which was used for parking, at an annual rental of $17,000, plus all real estate taxes in excess of $5,220 annually. Tenant paid basic liability insurance, fuel and all utilities. Owner was responsible for fire and extended coverage insurance and structural, mechanical and exterior repairs.

Acme Markets closed the store in 1972 and, since that time, it has been unoccupied.

The building has brick on the front elevation, an aluminum framed entrance and window areas, minimum porcelain veneer, wood framed roof, 12–foot high ceiling, generally open area with few framed partitions, old–fashioned metal ceilings and

fluorescent lighting. It has an oil fired Kawanee boiler and a small loading area with access from the adjoining lot. It has no sprinkler system.

The building is in generally good condition, except that the owner has failed to make repairs during the period of time when it has been unoccupied. This has caused some leaking from the roof.

Plaintiff has testified that, since the store was vacated by Acme Markets, Inc., both the owner and Acme Markets, Inc., have attempted to obtain another tenant. However, they have been unsuccessful to date. The rent, however, has been paid during the full term of the lease, which expired in August 1977.

Plaintiff introduced the testimony of an expert witness who testified that, as of the assessing dates for the tax years 1975, 1976 and 1977, the true value of the property, improved with the building, was $49,600. With respect to the tax year 1978, he testified that the true value was $44,700.

Plaintiff's expert utilized the income approach to reach the true values to which he testified and did not utilize either the cost approach or the market approach to test the accuracy of his computations.

In his computations for the first 3 years, plaintiff's expert relied upon the lease which was in effect as of the assessing dates. That lease called for a rental of $17,000 plus payment of all real estate taxes by the tenant which were in excess of $5,220. Further, the landlord was to pay for fire and extended coverage insurance, as well as to be responsible for structural, mechanical and exterior repairs. Plaintiff's expert computed total deductions of $9,058 which included the real estate taxes for which the owner was liable, as well as insurance, mainte-nance and repairs, reserve for alterations and replacements, leasing commissions, management costs and professional fees and miscellaneous. This left a net income to the property of $7,092. As the lease arrangement included the parking lot adjacent to the subject property, plaintiff's expert, in effect, permitted a 9 percent rental payment on the assessed value of

the property, which was $16,000. He also then subtracted, as a return to the land of the subject property, a 9 percent return. The above computation resulted in the amount of $3,852 being attributed to the building. This amount was capitalized at a rate of 13 percent, which included a 9 percent return and a 4 percent recapture. The resulting value attributed to the building was $29,600 which, together with the $20,000 attributed to the land, resulted in a value of $49,600.

For the year 1978, the plaintiff's expert assumed an economic rent of $12,000 with a 10 percent vacancy and collection loss. From the resulting $10,800 he deducted insurance of $2,000 together with estimated costs of maintenance and repairs, reserve for alterations and replacements, leasing commissions of 5 percent, management of 3 percent, and professional fees and miscellaneous. This resulted in a deduction of $4,040 or a net income to the property of $6,760. Assuming a return of 9½ percent, after taxes, to the subject land as well as to the adjacent parking lot, he deducted from the net income the amount of $3,420, leaving a net income to the building of $3,340. This was capitalized at a rate of 13.5 percent, of which 9.5 percent was deemed a return on investment with a 4 percent recapture rate. This resulted in a value attributable to the building of $24,700 which, when added to the value of $20,000 attributed to the land, came to a true value of $44,700.

Defendant introduced the testimony of an assessor who valued the subject property as of the critical date for all four years at $95,100, divided between $75,100 for the building and $20,000 for the land. In so doing, she utilized the market data approach in comparing the subject property with 3 allegedly comparable properties in the area which were sold in the period 1975 through 1978.

The property at 1109–1115 South Orange Avenue, which was deemed to be similar, was sold for $80,000 on January 23, 1975. It had a brick and concrete block exterior, was 50 years old, and had 12,000 square feet of land area with 9,600 square feet of building area. It sold at $8.33 a square foot of building area,

which the witness adjusted upward by 10 percent because it was older than the subject building, and another 10 percent because there was no offstreet parking as compared with the limited offstreet parking of the subject building. This resulted in an adjusted comparable price of $10.07 per square foot of building area.

The second comparable was property located at 432–40 South Orange Avenue and 410–422 South 14th Street. It was deemed to be in an inferior location. It sold at $125,000 on October 12, 1978. It was used by a wholesale food distributor and was a brick and steel frame building, 70 years of age. The land area was 30,750 square feet, with a building area of 11,725 square feet. This resulted in a price per square foot of building area of $10.66. The witness increased the aforesaid figure by 10 percent because of the superior location of the subject building, increased the adjusted figure by 15 percent because of the age and condition of the subject building, and decreased the adjusted figure by 20 percent to reflect the additional offstreet parking in the comparable building. This resulted in an adjusted sales price of $10.80 a square foot.

The third comparable was 210–14 Stuyvesant Avenue which is considered to be in a superior location. It sold for $105,000 on September 19, 1978. It was used as a post office, has a brick steel frame, and is 13 years old. The land area was 8,000 square feet and building area 5,300 square feet. The witness computed a price per square foot of building area of $19.80 and adjusted said figure by subtracting 10 percent because of its superior location to the subject property, subtracting 15 percent because of its being newer than the subject property, subtracting 10 percent because of the quality of construction as compared to the subject property, and subtracting 20 percent because it was under lease to the United States Post Office. This resulted in an adjusted sales price of $10.91 per square foot of area.

The witness then concluded that the appropriate method of valuing the subject property by the market data approach was to multiply the 9,600 square feet, which she deemed to be the

square foot area of the subject property, by the computed $10.50 per square foot of building area. This resulted in a value of $100,800.

The witness also utilized an income approach by taking the $17,000 rental contained in the lease and averaging that figure with a $20,000 asking rental. The witness testified that she had contacted a representative of the taxpayer and had been told that the property would be rented at a $20,000 figure. The $18,500 average figure was reduced by 5 percent for a vacancy and loss factor, leaving an effective gross income of $17,575. She estimated expenses at 10 percent, or $1,757, arriving at a net income of $15,818. Utilizing a land value of $20,000 and a factor of 14.66 percent, which was composed of an 8 percent interest rate and a 6.66 percent effective tax rate, she deemed $2,932 of the income attributable to the land. The balance of $12,886 was capitalized by the aforesaid 14.66 percent plus a 2.5 percent depreciation rate, or 17.16 percent. This resulted in a value attributable to the building of $75,093, or $75,100. Combining the $75,100 with the $20,000 land value, she arrived at a figure of $95,100 under the income approach. Combining her market data approach and her income approach, she concluded an appraised value of $20,000 for the land and $78,000 for the building, or a total of $98,000.

In reviewing the undisputed facts in this case and analyzing testimony and valuation reports of the respective witnesses who testified, I find that I cannot completely agree with either of the valuation opinions. Accordingly, I shall utilize those undisputed facts, together with those portions of the respective testimony and opinions of the two experts which are the most convincing, in order to reach a value for each year. See *Samuel Hird and Sons, Inc. v. Garfield*, 87 *N.J.Super.* 65, 208 *A.*2d 153 (App.Div. 1965).

■ I agree with plaintiff's expert witness to the extent that the greatest emphasis should be upon the economic analysis approach. See, however, *New Brunswick v. State of N.J. Div. of Tax Appeals*, 39 *N.J.* 537, 551, 189 *A.*2d 702 (1963), wherein the court stated:

"... Although capitalization of income is an acceptable approach, it is beset with so many debatable incidents that it should not lightly be accepted as the single solvent of a quarrel over assessment. Generally it is well to measure its results against other known data and the common sense of the situation."

Plaintiff's expert relied completely on the income approach without measuring its result against any other approach. Further, he utilized the assessment value as the market value for the adjacent unimproved property, a basic component in his computation. He determined what was, in effect, a rental for the adjacent lot which was included in the lease on which he relied. It is a highly questionable practice to apply a 9 percent or 9.5 percent after tax return to the assessed value of an adjacent lot in order to compute a rent. This is particularly so when he is testifying, and his valuation report shows, that the assessing practice in Newark was at a ratio of approximately 70 percent of true value. Using the assessed values results in the adjacent improved lot being valued at $1.84 a square foot while the subject land was valued at $1.33 a square foot. Further, his expenses for a single tenant rental property should be reduced by combining management and professional fees, which he determined to total $730.00. These should total $230.00. With respect to the taxable year 1978, he estimated insurance to be $2,000, as distinguished from actual insurance of $1,328 in prior years. He justified this by saying that he was now insuring an empty building. However, we are not valuing the property on the basis that it will remain an empty building; we are valuing property on the basis that it was capable of being rented and, as such, the insurance feature should remain as it was in prior years.

The taxing district's assessor utilized comparables which required adjustment other than that which she gave them. The comparable located at 1109–1115, South Orange Avenue, which was sold for $80,000 on January 23, 1975, was sold with a down payment of $10,000 and a $70,000 mortgage at 6 percent interest. As the taxpayer's witness properly pointed out, the 6 percent mortgage was at a lower interest rate than normally required during that period, and there should have been adjustments to reflect that as well as the low down payment. Fur-

ther, I find it difficult to justify a 10 percent differential because the comparable property was 50 years old and the subject property 40 years old.

With respect to the property at 432–40 South Orange Avenue and 410–422 South 14th Street, a 15 percent adjustment because the subject property was 30 years younger than the comparable property, particularly where the comparable property was made of brick and steel, a superior construction, is not warranted.

As to the comparable at 210–14 Stuyvesant Avenue, which was rented as a post office, it is much smaller in land area and not the most desirable comparable. Further, the quality of the tenant is not a proper adjustment.

The income approach which was utilized by the assessor estimated a rent of $18,500 per annum which was computed by utilizing the leasehold rent of $17,000 plus what the assessor ascertained was the present asking rent for the premises. It should be noted that the $17,000 leasehold rent included both the subject property and the adjacent parking lot and that the tenant was responsible for all taxes on both lots which exceeded $5,220. Even if it was to be assumed that $18,500 would be the economic rent of the subject property, the estimated expenses equal to 10 percent is obviously inadequate, and there was no support for it in the record. Further, the capitalization factor included an 8 percent interest rate which was inadequate as an investment return for this type of property.

Recognizing that the owner received the rents under the lease previously referred to up to July 13, 1977, and as this preceded the assessment date by only 2 months, the value as of October 1, 1977 would not be such as to be materially different from the true values for the previous years. Accordingly, I find that the values for the subject property as of the assessment date for each of the 4 years were the same.

In computing that value, I have utilized the approach taken by the plaintiff's expert witness and, with the following detailed adjustment, have made it applicable to all years.

Net income to the property has been increased by $500 to reduce those charges for management and professional fees from $730 to $230. I have inserted a rental for the adjacent property of $600 rather than the adjustment which had the effect of permitting a rental of $1,440 per annum. I have done this because there is no showing that the adjacent property, although providing additional parking space, can be deemed to require a return as an investment property equal to the subject property. It was an unimproved piece of property and, while having some benefit to the subject property when the subject property was being utilized as a supermarket, would not necessarily have the same utility if the subject property was being utilized for some other purpose. I believe that the $600 rental, together with full payment of property taxes, represents a return which an owner of that property could and would be satisfied with inasmuch as I am not satisfied that its highest and best use was a parking lot in conjunction with the subject property. It should be noted that the subject property had space to park 6 or 7 vehicles at the side of the building.

The aforesaid adjustments resulted in an adjusted net income to property of $7,192. From this is subtracted the amount of $1,800 representing a 9 percent return on the $20,000 value attributable to the land. The resulting figure of $5,392 was capitalized at a factor of 13 percent and resulted in a value attributable to the building of $41,477. To this is added the land value of $20,000, resulting in a value of $61,477 under the income approach method.

I have utilized the property at 1109–1115 South Orange Avenue to test the above approach. That property was sold for $80,000 on January 23, 1975 with a down payment of $10,000 and a $70,000 mortgage at 6 percent interest. It was slightly larger in building area but smaller in land area and was slightly superior in location. The price of $80,000 was obviously inflated due to the low down payment and the 6 percent mortgage. However, changing the payments made under that 6 percent mortgage to reflect payments under a 9 percent mortgage over a 10 year term would result in an adjustment of $8,650. A

longer term would give an increased adjustment resulting in a lower effective sales price. However, the record fails to show the mortgage term.

■ Testing the income approach value against the aforesaid comparable sale, I find that the true value of the subject premises for each of the taxable years involved was $64,000, of which $20,000 is attributable to the land and $44,000 is attributable to the building.

Applying the ratios agreed upon by the parties, a judgment will be entered for each of the taxable years for the following assessment values:

|      | Land     | Building | Total    |
|------|----------|----------|----------|
| 1975 | $20,000  | $25,984  | $45,984  |
| 1976 | $20,000  | $26,458  | $46,458  |
| 1977 | $20,000  | $22,893  | $42,893  |
| 1978 | $20,000  | $25,440  | $45,440  |