CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks review of the assessment imposed upon its property located at Route 46 and the Garden State Parkway in Clifton, New Jersey (Block 28-2, Lot 1) for the years 1979, 1980 and 1981. Plaintiff’s appeal for 1979 is from a county board judgment affirming the assessment. Plaintiff filed complaints by way of direct appeal with this court for 1980 and 1981 pursuant to N.J.S.A. 54:3-21. The assessment for all years was:
Land $ 2,047,500
Improvements 8,440,300
$10,487,800. Total
At issue are the true value of the property, whether the assessment is discriminatory and whether plaintiff’s failure to plead discrimination for 1981 forecloses discrimination relief for that year.
*212 The subject of the controversy is an owner-occupied manufacturing complex comprised of 13 buildings devoted to manufacturing, warehousing, laboratory and office uses sited on 40.91 acres. The buildings, which aggregate 645,062 square feet, were erected at various times between 1946 and 1977, with substantial remodeling done and renovations made over the years. Other site improvements consist of paving, railroad siding, chain link fencing, storage tanks, a silo, pump house and guard house.
The use of the property as a manufacturing, storage and product-testing facility is within the range of uses permitted by defendant’s zoning ordinance.
Passaic County, wherein the defendant municipality is located, lies within the inner ring of the 22-county region forming the New York-New Jersey-Connecticut metropolitan area, which is the most densely populated and one of the most highly industrialized sections of the United States. Clifton is situated in the extreme southeastern section of Passaic County and lies approximately 13 miles west of New York City and seven miles north of Newark, New Jersey. It is located one mile south of 1-80, a major east-west interstate highway and three miles west of the New Jersey Turnpike. Major connecting roads include Route 3, providing a direct east-west link with the Lincoln Tunnel into New York City, and Route 46, which traverses Clifton in an east-west direction and is a major secondary route extending from the George Washington Bridge westward to Pennsylvania. The latter route parallels and connects with 1-80 and links with the northern end of the New Jersey Turnpike.
Access to the site is from Colfax Avenue, a local thoroughfare bordering the southwest portion of the property. Access to Route 46, which abuts the property on the north, is readily available over Colfax Avenue. Large commercial vehicles are not permitted on the Garden State Parkway.
The highest and best use of the subject property is a continuation of its present use. The property is, however, readily *213 adaptable to multiple industrial uses without the need for substantial conversion costs. In fact, several buildings have been devoted over the years to multiple uses.
VALUATION
Plaintiff’s expert, using all three approaches to value, estimated the true value of the subject property to be $12,185,000 for all years in issue. In reaching this conclusion he relied primarily upon the market data approach, with secondary, confirmatory support from the cost and income approaches. His market data approach rested upon 26 comparable sales. These sales were divided into three groups. The first group, consisting of seven transactions, reflected sales of smaller industrial buildings in Clifton ranging in size from 38,600 square feet to 112,531 square feet and selling for prices ranging from $12.63 to $17.80 a square foot of building area. The sales in this group occurred between June 1, 1977 and December 1980, with three of them falling in 1978. Land-to-building coverage ratios ranged from 1.33 to 1 to 3.39 to 1, with coverages in four of the sales ranging from 2.18 to 1 to 3.12 to 1. The second group reflected nine sales of industrial buildings within the subject’s region. The comparables in that group ranged in size from 52,000 square feet to 475,000 square feet and sold for prices ranging from $9.36 to $28.25 a square foot. The sales in this group occurred between August 1976 and July 1980, with four of them taking place in 1978, 1979 and 1980. Land-to-building coverage ratios ranged from 1.55 to 1 to 3.35 to 1. The final group of ten sales is purportedly representative of multi-functional buildings or groups of buildings devoted to office, research, laboratory and other industrial uses. These sales were distributed over a large geographic area, extending from Yonkers, New York to the north, Cranbury, New Jersey to the south, Bayonne, New Jersey to the east and Branchburg, New Jersey to the west. The size of the structures involved ranged (with one exception) from 127,800 to 320,000 square feet, while the prices ranged from $16.62 to $35.99 a square foot. Of this final group of ten sales, five sold for prices *214 ranging from $21.02 to $27.05 a square foot. The latter price reflected a sale with an extraordinarily high building coverage ratio of 25.8 to 1, indicating the likelihood of excess land. The sales in this final group occurred, with one exception, between August 29, 1977 and August 12, 1980. Five of the sales took place in 1978 and 1979. The land-to-building coverage ratios in six of these sales ranged from 2.69 to 1 to 5.44 to 1.
Plaintiffs expert, on the basis of his comparable sales, estimated the unit value of the subject property to be $22 a square foot, land and buildings merged. He then applied this unit value to what he considered the gross saleable building area of 553,864 square feet to arrive at his market-based value estimate of $12,185,000. He concluded that 88,263 square feet of basement space was nonsaleable, as were a six-car garage containing 1,760 square feet and a maintenance garage of 1,175 square feet.
Defendant’s expert, using the cost and income approaches to value, estimated the subject’s true value to be $17,000,000 for all years under review. In reaching this conclusion he placed principal reliance upon the income approach, with the cost approach playing a significant supporting role. The linchpin of the expert’s income approach was his calculation of economic rent, purportedly derived, for the most part, from six allegedly comparable warehouse leases with net rentals ranging from $1.75 a square foot to $2.56 a square foot and demised building area ranging from 98,000 square feet to 234,000 square feet. The inception dates of five of the leases ranged from 3V2 to 6V2 years prior to the earliest assessing date. The expert made time adjustments for these leases of 40% to 70%.
Defendant’s expert also relied upon a plethora of leases of smaller buildings devoted, in the aggregate, to warehouse and laboratory uses as well as 12 office rentals. On the basis of all the foregoing leases the expert estimated an economic rent, for tax year 1979, of $5 a square foot for the office building and laboratories, $2.25 a square foot for the warehouses, $3 a square foot for the manufacturing buildings, $2.50 a square *215 foot for the garage and $1.50 a square foot for the basement space. These estimations produced a gross income of $2,110,-000 from which he deducted a 5% vacancy factor and $127,635 in expenses (calculated on a net lease basis) to arrive at a net income of $1,876,865. This figure was then capitalized at 11% for a 1979 value of $17,000,000. For each of the tax years 1980 and 1981 the expert simply adjusted the foregoing income and expenses by 5% and applied a capitalization rate of 11.5% for 1980 and 12% for 1981, reaching the same value of $17,000,000 for each of the latter two years.
Defendant’s expert placed secondary reliance upon the cost reproduction approach, pursuant to which he estimated a depreciated value of all improvements as $14,928,000, to which he added his estimated land value of $2,659,000 for a total value of $17,500,000 (rounded). He justified the use of the cost approach by characterizing the subject as special-purpose property, built, designed and adapted over 32 years for the manufacture, storage and sale of plaintiff’s products. His conclusion of special purpose was predicated upon the number of buildings and their configuration, the limited market for 13 buildings in single ownership on 40 acres of land, and the adaptation of the entire complex to the particular needs of plaintiff’s operations. He did not conclude that the buildings were not readily adaptable to alternate uses.
Defendant’s expert rejected the market data approach because of an alleged paucity of sales.
There is no single doctrinaire approach to the valuation of real property. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965); ITT Continental Baking Co. v. East Brunswick, 1 N.J.Tax 244 (Tax Ct.1980). The choice of the predominant approach will depend upon the facts of each case and the reaction of the experts to those facts. New Brunswick v. N.J. Div. of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963); Pennwalt Corp. v. Holmdel Tp., 4 N.J.Tax 51 (Tax Ct.1982). In this case I find the market data approach employed by plaintiff’s expert to be the most per *216 suasive. Valuation of industrial property by sales comparisons of like properties gives the best indication of market value. Kinnard, Messer and Boyce, Industrial Real Estate (3 ed. 1979) 445. Moreover, the income approach, relied upon by defendant’s expert, is inapplicable in the valuation of property, such as the subject property, for which a rental market or rental value cannot be identified. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978) 323.
The cost approach used by both experts is a viable indicator of value when the improvements are new and all forms of depreciation are measurable. Id. at 507. This method, however, may result in serious error when depreciation is not reliably measurable. Thus, most courts have utilized this method as the primary value determinant in those limited situations in which no other method will yield a realistic value estimate. 1 Bonbright, Valuation of Property, 175-176. This pragmatic approach has been incorporated in modern appraisal practice, which has relegated the cost approach to a secondary role as not reflective of market conditions. O’Flaherty, “Cost Approach to Value,” Friedman, Encyclopedia of Real Estate Appraising (3 ed. 1978) 66-67.
The cost approach as employed by defendant’s expert suffers from yet another flaw.
He testified that his use of the cost approach was based upon the special-purpose character of the subject, that it was special purpose in nature because of its size, the configuration of the buildings, the limited market and the adaptation to plaintiff’s use as a multi-functional complex for the manufacture, storage and sale of plaintiff’s products. The expert did not posit his conclusion of special purpose upon the absence of adaptability for alternate uses. The expert’s conclusion is not in accord with sound appraisal principles. Special purpose property has been defined as:
... property devoted to or available for utilization for a special purpose, such as a clubhouse, a church property, a public museum, a public school, and so on. It *217 also includes other buildings having value, such as hospitals, theatres, breweries, etc., which cannot be converted to other uses without large capital investment. [Boyce, Real Estate Appraisal Terminology (1981) 226]
As indicated above, the subject property is adaptable to alternate or multiple uses without the need for substantial conversion costs.
Moreover, limited-market property is not necessarily special-use property. If a reasonably active, albeit limited, market is shown to exist, the property is not appropriately characterized as special use or purpose. See Albritton, “Valuation of Special-use Property Types,” XLVIII The Appraisal Journal 367 (July 1980). The subject’s size, i.e., over 600,000 square feet of buildings on 40 acres of land, while perhaps indicative of a limited market, does not compel the use of the cost approach to value. Dworman v. Tinton Falls, 1 N.J.Tax 445 (Tax Ct.1980), aff’d o.b. per curiam 180 N.J.Super. 366, 434 A.2d 1134, 3 N.J.Tax 1 (App.Div.1981), certif. den. 88 N.J. 495, 443 A.2d 709 (1981); nor is the adaptation to plaintiff’s particular needs indicative of a special purpose property. Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax 486 (Tax Ct.1982).
The income approach posited by defendant’s expert fares no better. Dealing as he was with owner-occupied property, he was impelled to construct an amalgam of attenuated hypotheses concerning economic rent, projected expenses, whether the leases would be gross or net, whether the property is best suited for a single tenant or multiple tenancies and the anticipated return on investment. As stated in one authoritative work:
The difficulties and disadvantages of the income approach are numerous. They all revolve around the fact that a large number of estimates must be made; therefore, in most cases a complex set of relationships must be developed. The appraiser may have to inject his own analytical judgment and skill into the analysis more than is desirable. [Industrial Real Estate, supra at 478]
The sheer number of interdependent assumptions, none of them fortified by hard data, precludes acceptance of defendant’s expert’s income approach as a viable indicator of value.
The approach to value which is best supported by factual data is the primary approach, relegating the other *218 approaches, at best, to secondary roles. Sunshine Biscuits, Inc. v. Sayreville, supra. In this case plaintiffs market data approach provides the most persuasive evidence of the subject’s value. His comparable sales, showing comparable building density ratios, functional similarities, proximity of sale dates to assessing dates, similarity of age, construction and condition (and in some cases, size), all lend logical and cogent support to his conclusions. The comparables represent realistic alternatives for prospective purchasers of industrial property.
In view of the foregoing I accept the value estimate of plaintiff’s expert, predicated on the market data approach, of $22 a square foot. However, his conclusion with regard to so-called nonsaleable space is not supported by credible evidence. The record is devoid of any indication that the parties to the comparable sales utilized by the expert were influenced by any qualitative distinctions between saleable and nonsaleable space. I will therefore apply the aforementioned unit value to the entire building square footage of the subject.
Accordingly, I find the true value of the subject property for all years under review, to be $14,191,000 (645,062 square feet X $22 [rounded]).
DISCRIMINATION
For years subsequent to 1977, statutory relief from discriminatory real property tax assessments is available under what is commonly referred to as Chapter 123. N.J.S.A. 54:2-40.4 is a part of that legislative design and deals with its application in this court. Subsection (a) thereof provides:
Whenever the tax court is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property except as hereinafter provided.
The term “average ratio” is defined in N.J.S.A. 54:l-35a as the ratio of assessed to true value of real property for a taxing district promulgated by the Director, Division of Taxation (hereinafter Director) pursuant to N.J.S.A. 54:1-35.1 (dealing with *219 tables of equalization for state school aid purposes). “Common level range” is defined in N.J.S.A. 54:l-35a as that range which is plus or minus 15% of the taxing district’s average ratio.
The average ratio and common level range for the defendant taxing district for each year in issue, duly promulgated and certified by the Director, were as follows:
Common Level Range
Year Average Ratio (%) Lower limit Upper limit (%) (%)
1979 74 62 86
1980 66 56 76
1981 59 50 68
The ratio of the assessment to the true value as hereinabove found is 74%, which falls within the limits of the common level range for 1979 and 1980. Accordingly, plaintiff is entitled to no discrimination relief for those years. The assessment-to-value ratio for 1981 is another matter. That ratio exceeds the upper limit of the common level range, thereby entitling plaintiff to relief under N.J.S.A. 54:2-40.4(a). Plaintiff’s failure to allege discrimination in its 1981 complaint is not fatal to its discrimination claim. The Superior Court, Appellate Division, has recently held, in effect, that Chapter 123 is present in every case, and that this court must apply it to the determination of true value in ascertaining the correct assessment. Weyerhaeuser Company v. Closter Boro., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div.1983). Indeed, this court’s pretrial order indicated its intention to apply Chapter 123 if appropriate.
Judgment will be entered affirming the assessment for 1979 and 1980 and determining the assessment for 1981 to be as follows:
*220 Land $1,674,500
Improvements 6,698,200
Total $8,872,700.