HOPKINS, J.T.C.
This matter involves an appeal and counterclaim with respect to the judgment of the Bergen County Board of Taxation for tax year 1980 and a direct appeal for tax year 1981. Both appeals relate to local property tax assessments on property designated as Block 3203, Lot 1 in the taxing district of Fort Lee.
The assessments and the 1980 county board judgment, together with the parties’ alleged values, are as follow:
Tax Year Assessment County Board Judgment Borough's Value Taxpayer’s Value
1980 $31,168,700 $26,668,700 $32,250,000 $22,287,100
1981 31,168,700 None 38,725,000 23,390,700
The property involved is a 30-story and basement super-luxury apartment building containing 176 apartments, automobile garages and on-site parking for 342 cars, two tennis courts and a swimming pool. The parties are in agreement as to its physical characteristics. It is owned and occupied as a cooperative apartment building and is known as The Plaza.
*581 These appeals are sequels to the tax appeals involved in Southbridge Park Inc. v. Fort Lee, 4 N.J.Tax 30 (Tax Ct.1981), aff'd 6 N.J.Tax 351 (App.Div.1984). In that case it was held that the sales prices of stock and proprietary leases in a cooperative apartment building are the predominant components in determining such property’s taxable value. Further, the court also held that such value should be tested to ensure that it was fully attributable to the property and not to the form of ownership. In so doing, it quoted from The Appraisal of Real Estate, as follows:
Basic to the cost approach is the principle of substitution: No prudent person will pay more for a property than the amount for which he or she can obtain by purchase of a site and construction of a building without undue delay, a property of equal desirability and utility. Consequently, reproduction cost new, prior to any deduction for accrued depreciation, plus land value, tends to set the upper limit of value. Developer’s profit in a typical development also becomes part of cost new in the context of this statement. [American Institute of Real Estate Appraisers, the Appraisal of Real Estate (7 ed. 1978) at 263-264]
In applying the above principles to the subject assessments, taxpayer’s expert acknowledged that if the property were valued by having the sales prices of the stock and proprietary leases comprise the predominant components in such computation, the values for 1980 and 1981 would approximate $30,000,-000 and $38,000,000, respectively. However, he fully relied on a cost approach which produced lesser values. Borough’s expert, in a detailed analysis of Plaza units sold during the years 1975 through 1981, concluded values predicated both on value per square foot and value per share of stock as of the assessment dates.
In computing the value based upon square feet, borough’s expert determined that the structure had a total floor area of 334,370 square feet and that the value was $109 a square foot as of October 1, 1979 and $125 a square foot as of October 1, 1980. The value concluded was discounted to take into consideration underlying favorable financing since there was a first mortgage of $8,200,000 with interest at 8% for 26 years and a second mortgage in the amount of $2,200,000 with interest at a rate of 5% for a period of 26 years. He discounted both mortgages, the first mortgage to reflect an interest rate of 12% *582 and the second mortgage to reflect an interest rate of 13% as of the assessment dates. The market values concluded by this method were $33,448,000 as of October 1, 1979 and $38,929,000 as of October 1, 1980.
His analysis of Plaza sales, based upon the values attributed to the stock, resulted in values of $375 a share of stock as of October 1,1979 and $492 a share of stock as of October 1, 1980. To these figures he added the discounted value of the underlying mortgages since the purchasers took the property subject to those encumbrances. The market values concluded on that basis were $31,084,000 as of October 1, 1979 and $38,657,000 as of October 1, 1980.
The record shows that the proprietary leases for the various Plaza units were originally offered to the public at a price computed by multiplying the number of shares associated with the lease by the uniform price set for each share of stock. In this manner, the share price represented a uniform element of value attributable to all units.
Since the number of shares attributable to the proprietary leases bears a direct relationship to the quality of the apartment unit, it is concluded that a value predicated on share values does not suffer from the problems involved in valuing by the square feet of the unit sold. The sales sampling for the latter purpose may not reflect the average in the building. Accordingly, the methodology of valuing by use of the sale prices of the stock will be adopted.
Borough’s expert’s conclusion that the share value as of October 1, 1979 was $375 a share is justified based upon an analysis of sales occurring on or before October 1, 1979. However, his value of $492 a share as of October 1, 1980 is not supported by sales on or before that date. Prior to October 1, 1980, there was no sale at a price in excess of $469.50 a share. The higher values occurred in sales subsequent to October 1, 1980, namely, $578.35, $475.50, $472 and $567 a share. While the trend, as of October 1,1980 was obviously upward, it is also apparent that he utilized sales subsequent to the assessment *583 date to conclude a value per share of $492. Such value should be based upon facts known or reasonably ascertainable as of the assessment date, unaided by hindsight. New Brunswick v. Div. of Tax Appeals, 39 N.J. 537, 545, 189 A.2d 702 (1963); Fort Lee v. Invesco Holding Corp., 3 N.J.Tax 332 (Tax Ct.1981), aff’d 6 N.J.Tax 255 (App.Div.1983), certif. den. 94 N.J. 606, 468 A.2d 238 (1983). Accordingly, a review of the prices per share detailed, as of October 1, 1980, indicates a market value per share in the amount of $470 rather than the $492 proposed by borough’s expert. Utilizing borough’s value for the underlying mortgages, the resulting values, based upon the market prices of the stock, are $31,084,000 and $37,221,000 for the 1980 and 1981 tax years, respectively.
Taxpayer’s expert placed total reliance on the cost approach in concluding values for the subject property. Borough’s expert, while disclaiming any reliance on the cost approach in concluding a value, did utilize that approach in his appraisal report.
N.J.S.A. 54:4--23 provides the statutory criterion for determining value in local property tax cases. It provides that:
[A'Jfter examination and inquiry, [the assessor shall] determine the full and fair value of each parcel of real property situated in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments, as hereinafter required.
In New Jersey, that concept has been expressed in terms of the price which can be obtained for property, in money, at a fair sale between a willing seller and a willing buyer. New Brunswick v. Div. of Tax Appeals, supra, 39 N.J. at 543, 189 A.2d 702. The appropriate approach to ascertaining the taxable value of property depends upon the facts of the particular matter. Id. at 543-544, 189 A.2d 702. In valuing condominium apartment buildings for local property tax purposes, the predominant components in determining the subject property’s taxable value are the sales prices of the stock and proprietary leases. Southbridge Park Inc. v. Fort Lee, supra. Further, the cost approach, which includes depreciation and *584 obsolescence factors, loses much of its credibility when applied to buildings that were not recently constructed or unique in nature. Center-Whitemen Corp. v. Fort Lee, 4 N.J.Tax 153, 160 (Tax Ct.1982). Depreciation and obsolescence factors are often backed into through the use of either the capitalization of income approach or the market approach. Pantasote Co. v. Passaic, 6 N.J.Tax 34 (Tax Ct.1983), aff’d 7 N.J.Tax 663 (App.Div.1984). See also Thayer, “Rethinking the Cost Approach,” The Appraisal Journal, April, 1983.
While the cost approach to value, which takes into consideration physical depreciation as well as functional and economic obsolescence, is not deemed to be the appropriate approach to valuing the subject property, it was noted in the prior South-bridge Park case that there are certain elements of the cost approach which could be used to test whether the value based on the sales prices of the various units is fully attributable to the property rather than to the form of ownership. It is noted that the prior case involved the years commencing with 1973 when the cooperative form of ownership by apartment occupants was a phenomenon developing in Fort Lee. However, as of 1980 and 1981, it was a well-established way of life and no longer so unique that it should not be governed by accepted principles of valuation for tax purposes. The many thousands of Fort Lee families which, in 1980 and 1981, occupied apartments under this form of ownership were obviously enjoying a life-style which, while different, was no less a life-style than if they occupied individual family units with backyards as was prevalent in most New Jersey suburbs. However, as the prior case describes a modified cost approach as a test of value, it is appropriate to determine the effect of that test on the taxable value of The Plaza.
The test is basically the replacement cost, without taking into consideration any depreciation or obsolescence, and adding land value and developers’ profit. Those elements tend to set the upper limit of value and are not to be deemed a valuation approach. Further, that test is based upon the principle of substitution, i.e., that no prudent person will pay more for *585 property than the amount for which he or she can obtain, by purchase of a site and construction of a building without undue delay, a property of equal desirability and utility. The court recognizes that a period of time is necessary to prepare plans, obtain permits and financing for a structure of this type and, as borough’s expert testified, it takes a year and a half to two years from the time the first shovel is put in the ground until property of this type is completed. Accordingly, one must look at that test in the light of what is meant by undue delay.
In applying the above test, the two cost-approach valuations have been examined and the original difference was basically predicated on land value. In that respect, taxpayer’s expert utilized three sales which occurred during the period 1970 to 1973, or approximately six years prior to the earliest assessment date. Of those three, two were in the neighboring community of Cliffside Park and one encompassed land in Fort Lee, Cliffside Park and Edgewater. He valued the land on the basis of the number of units that could be constructed on it under the zoning laws then in effect. The sales which he utilized show that the land was being sold at unit prices of from $2,425 to $3,911 a unit. However, all such sites were inferior in location to the subject site which was considered one of the superior locations in Fort Lee.
Borough’s expert, on the other hand, utilized six sales, including one which was a resale, together with a contract, in arriving at a value per unit of $15,000. While there was a void in land sales during the period 1972 through 1979, the growing number of cooperative and condominium units showed a potential market for vacant land available to build that type structure. This was evidenced by one of borough’s sales, an inferior site, which sold on April 3, 1979, for $11,400 a unit. Two subsequent sales in 1981 and 1982 sold at $14,045 and $16,073 a unit, respectively. Those latter two sales were also inferior in location to the subject property. Accordingly, based upon the latest sale prior to the assessment dates and using the subse *586 quent sales for corroboration purposes only, it is concluded that borough’s land values are appropriate.
In computing a cost new as of the assessment dates, the Local Property Appraisal Manual for New Jersey Assessors (manual) was utilized. The manual was first introduced in 1955. The edition which the parties used was published in 1964 and revised in 1965 and 1974. At issue in the use of the manual is whether the base unit construction cost included indirect costs. All parties recognize that the cost approach to value must include these latter costs.
The manual does not make any specific reference to the use of indirect costs. The most enlightening statement, in that respect, in the manual reads as follows:
The Local Property Tax Cost Index is based upon average labor and material prices in fifty representative cost areas of the state in October 1954. As these are also the basis of the building base unit reproduction costs in this manual, the conversion factor for these building base unit production costs is 1.00 or 100%. [Id. at 160]
On that same page, it specifically states that the cost conversion index which is used to bring the base prices up to the various years is based on (1) average prices of the more important material items; (2) prevailing rates of pay for building construction skilled and unskilled labor; and (3) indexes of wholesale prices of “plumbing fixtures and brass fittings”, “iron and steel” and “non-metallic mineral products.” Ibid.
The above statements would indicate that the manual is predicated on direct costs only. However, in a supplemental hearing permitted taxpayer, testimony was received from a former supervisor in the office of the Director, Division of Taxation, which prepared the manual, and it was his belief that the manual did include certain indirect costs. Further, a former employee of the Division of Taxation testified that he was one of a group that tested the manual against actual sales and that test indicated that the ultimate sales prices coincided with the values computed under the manual. Based upon that test, it was his belief that the manual figures reflected indirect costs.
*587 The latter witness, who is now a professional real estate appraiser, testified that the manual is very simplistic, designed for use by assessors, as distinguished from the more sophisticated manuals used by appraisers and builders. These latter include the Marshall Valuation Service (Marshall & Swift Pub. Co.). While taxpayer’s witnesses all believed that the manual did include certain indirect costs, it was clear that it did not include developers’ profit.
At the supplemental hearing, Borough’s expert testified that his review of the manual failed to disclose any statement to the effect that it included indirect costs. Further, he testified and included in his report statements from the Marshall and Swift manual which specifically detail when and where indirect costs such as architects’ and engineers’ fees, building permits, construction loan interest, sales taxes, normal site preparation, utilities from structure to lot line and contractors’ overhead and profit, including supervision, workers’ compensation, fire, life insurance, unemployment insurance, etc., are included. The Marshall and Swift manual specifically states that its costs do not include land assemblage, pilings or soil compaction and vibration costs, land planning or preliminary concepts and layout for large developments, nor interest or taxes on the land.
Further, in using the manual for purposes of testing the market value of the subject property, it should also be recognized that the manual classifies all high-rise apartment structures in one category. As previously noted, the subject structure is a super-luxury apartment building. The Marshall and Swift manual contains four classifications for apartment structures and, for example, as of December 1982, it detailed a cost per cubic foot of $4.67 for an average structure, as compared with a cost per cubic foot of $6.81 for an excellent structure. The superior building costs approximately 46% more.
The effect of using the Marshall and Swift manual to determine the costs, by using the “excellent” classification as compared with costs based upon the single classification in the manual, is detailed in the following schedule:
*588 Date Manual Marshall and Swift
October 1, 1979 $22,070,677 $29,290,000
October 1, 1980 23,479,444 31,927,000
If the land values as testified to by borough’s expert were added to the Marshall and Swift replacement cost figures and a 15% developers’ profit was added to reflect the necessary test detailed in Southbridge Park Inc. v. Fort Lee, supra, the values would be $36,719,500 as of October 1, 1979 and $39,752,-050 as of October 1, 1980. In computing those values, it is recognized that taxpayer introduced no evidence as to developers’ profit under the test. However, borough’s expert, in his explanation of the difference between the manual and the Marshall and Swift manual, did indicate a need for both a llk% normal developers’ profit and an additional 71/2% developers’ profit where the structure was to be marketed as a cooperative apartment building.
From the above, I find that taxpayer has failed to support a finding of value under the Southbridge Park test which would place a cap on the value computed through use of individual apartment sales occurring on or before the assessment dates. Further, I find that the values through the use of the apartment sales are $31,084,000 as of October 1, 1979 and $37,221,000 as of October 1, 1980.
The Clerk of the Tax Court will enter judgment showing a corrected assessment for tax year 1980 in the amount of $31,084,000 of which $2,640,000 will be attributable to the land. The assessment for tax year 1981 will be affirmed as it falls within the protective range provided by chapter 123 of the Laws of 1973, as amended.