EVERS, J. T. C.
This matter concerns the valuation of a high-rise residential building in Fort Lee Borough for the years 1977, 1978 and 1979 which was constructed in the 1976-1977 time period. It squarely presents the novel issue of the value of an improvement based on a theory that allegedly takes into account the rash of *157 conversions of rental properties into condominium or cooperative form.[1]
The subject property is commonly known as the Whiteman House, a 14-story and penthouse luxury apartment building containing 128 units situated on 1.145 acres of land. Without detailing the specific amenities, the improvement is a high-rise building of a luxury class typically found in the borough. In fact, the borough’s expert stated that there are approximately 80 such buildings located in the borough, containing in excess of 50 dwelling units. The subject property was assessed in 1977 through 1979 at $498,800 land and $5,456,600 building, for a total assessment of $5,955,400. The Bergen County Tax Board affirmed the original assessments.
For 1978 and 1979 the borough advanced its conversion value theory. Before addressing that novel approach to value, however, it is necessary to determine the 1977 valuation because the conclusions as to value for that year will substantially apply to all years if the borough’s conversion value theory fails. It did not essentially advance any other approaches to value.
The borough expert, as to the 1977 tax year, ostensibly employed all three approaches to value. His reproduction cost approach was based on data derived from the New Jersey Assessors’ Manual. He classified the building as a 14.6 multifamily elevator apartment of the fire resistant class and then adjusted the base cost by adding and deducting the cost of various features for a total reproduction cost of $5,502,741. This approach, which generally is not applicable to income properties, *158 was, according to the expert, reasonable in the case of valuing income properties during their incipient rent-up period.
The property had severe vacancy problems. In April 1977 only approximately 10% of the dwelling units were inhabited, while in March 1978 only approximately 70% were occupied. According to taxpayer, the vacancy problem was caused substantially by the fact that the property was subject to a very strict (later adjudged to be confiscatory) rent control ordinance that caused the following dilemma. New rentals were uncontrolled and thus could be set in accordance with the demands of the building’s debt service and the owner’s profit desires; yet, such rents were in competition with restricted, i.e., artificially low, rentals found in other buildings in the borough. There was evidence of certain financial concessions made to tenants, such as reduced garage rentals and partial payment of tenants’ electricity. Taxpayer’s expert also emphasized that the original property owner went through a foreclosure, thus further demonstrating that this property was not a healthy one.[2]
In the income approach borough’s expert utilized the potential rental gross income less a 10% vacancy allowance, to which was added miscellaneous income for a total effective gross income of $854,923. Stabilized operating expenses, taken from the owner’s certified statement for the period ending December 31, 1978, were then deducted. This statement was included in the audit of the property for the calendar year 1978. The income ratio as calculated therefrom was 35%. This result was capitalized at 8.5% interest, 2% recapture and an average tax rate for 1977, 1978 and 1979 of 2.2%.
In its market approach the borough offered three sales of purportedly comparable properties, all of which were located in the borough. Sale number 1 concerned the Imperial House, an eight-story and penthouse, 56-unit building with on-site parking and pool situated on approximately one-half acre. This sale was *159 transacted on March 12, 1979 and the property was sold for $2,400,000, or $42,857 a unit. Sale number 2 was a resale of Imperial House (sale # 1) in March 1980 for $4,205,061, or an indicated per-unit value of $75,090. Sale number 3 was of the Carriage House, a 19-story luxury apartment building with 292 units and four professional offices, situated on 2.2 acres of land, which sold in May 1980 for $15,003,619, or an indicated per-unit value of $51,382.[3] However, it was the borough expert’s opinion that for 1977 the cost approach was the most probative of market value in view of the operating history of the property.
Taxpayer relied solely on the income approach to value for all years in question.[4] From the gross potential rent was deducted $204,270 (approximately 24%) for vacancies, to which was added miscellaneous income for an effective gross income of $686,607. The total expenses amounted to $379,928, for a ratio of expenses to income of 55%. On cross-examination it was determined that although taxpayer’s expert did use the calendar year 1978 actual expenses, he did not cull them from the certified statement as did the borough’s expert. Also, unlike the borough’s expert, he included as an expense item, rental commissions paid to brokers. He then capitalized the net operating income at 11.84% (inclusive of interest and tax rate) by using the band of investment technique and opined that the fair market value of the property for 1977 was $2,240,000. This was actually a discounted figure of 10% for the 1977 assessment from the total indicated fair market value as of October 1, 1978 — the assessment date for the last year in question.
*160 Based on the record I find that the subject property is of the type customarily bought and sold on the basis of its income stream. See, generally, Helmsley-Spear v. Fort Lee, 78 N.J. 200, 394 A.2d 65 (1978), certif. den. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979), and Parkview Village Associates v. Collingswood, 62 N.J. 21, 297 A.2d 842 (1972). Consequently, the income approach will guide this court in its quest for true value. I am fully aware of the borough’s position regarding the application of the cost approach, an approach which is best suited in valuing special purpose property since such property, by its very nature, is not comparable to other property and does not generate income per se. See, generally, Anaconda Co. v. Perth Amboy, 157 N.J.Super.42, 384 A.2d 531 (App.Div.1978), remanded on other grounds, 81 N.J. 55, 404 A.2d 1155 (1979), and Bostian v. Franklin Nat’l Bank, 167 N.J.Super. 564, 401 A.2d 549 (App.Div.1979). In cases of nonspecial-use property this approach is, at best, a guide or “check” against the other two customary approaches to value. Cost, be it actual or estimated, is not value. Bostian v. Franklin Nat’l Bank, supra at 569, 401 A.2d 549.
The primary issue herein regarding the conflicting use of the income approach centers on the appropriate vacancy and collection loss. In addressing the topic in the “Appraisal of Real Estate,” American Institute of Real Estate Appraisers (7 ed. 1978), it is stated:
When the property being appraised is a new multi-occupancy improvement of substantial size, there may be an abnormally high vacancy in the early years while initial leasing is in progress. This may be of sufficient consequence to be reflected in the stabilized vacancy and loss allowance, particularly if the income is to be processed on the basis of a short term projection period, as under the mortgage-equity method of capitalization. However, the effect of this consideration may be compensated for, in whole or in part, by a lower estimate for repairs, maintenance, and replacements during this limited projection period, [at 339]
Based on the record I find taxpayer’s vacancy and collection loss is unreasonable. While I fully appreciate the difficulties to which the property was subjected and do not *161 doubt the validity of the actual vacancy rate, it nonetheless must be stated that in employing the economic approach to value one attempts to derive a present value from a projected, future income stream. Thus, a vacancy allowance diminishes the present value, if it is demonstrated that the rental stream may be subject to substantial dislocation causing a potential rental stream of questionable durability. The evidence suggested a borough-wide vacancy of around 1%, and a market that is burdened by too few available dwelling units and an extraordinary demand therefor. The borough’s expert testified to a flight by New York residents into the housing market of the borough and adjacent taxing districts. Although there was evidence of a foreclosure and substantial actual vacancies in the subject property, it cannot be said that such condition will persist over an extended period of time. Accordingly, I find that a generous vacancy and collection allowance of 10% is warranted under the circumstances of this case. Furthermore, I accord greater weight to the income and expense figures of the borough since they were taken from the more accurate certified statements of taxpayer’s auditors.
I further agree with the borough’s reasoning in excluding rental commissions as an expense. The rental market in the borough was such that the payment of commissions would not continue indefinitely and thus, in terms of stabilizing expenses, cannot be an enduring deduction from the rental income.
I will employ the straight-line recapture and building residual technique in capitalizing the net operating income as follows:[5]
*162 Apartment income $ 866,735
Vacancy and collection loss 10% _86,673
$780,062
Parking income 51,240
Vacancy and collection loss 25% 12,810
38,430
Laundry income 36,432
$854,924
Less expenses 304.998
Net operating income $549,926
In arriving at this conclusion I am not unmindful of the borough’s purported comparable sales which would buttress the original assessment for this year had it been demonstrated that they were substantially similar to the subject. Other than rudimentary comparisons, such as “high-rise luxury building,” “pool,” “on-site parking,” no testimony with respect to their similarities was offered. Furthermore, an appropriate time adjustment discount factor was necessary in light of the fact that these sales took place at least 2lA years beyond the October 1,1977 assessment date. See Venino v. Carlstadt, 1 N.J.Tax 172 (Tax Court 1980), aff’d 4 N.J.Tax 528 (App.Div.1981), certif. den. 88 N.J. 467, 443 A.2d 689. Furthermore, both sales occurred well beyond the date that the New Jersey Supreme Court declared the borough rent control scheme confiscatory (October 17, 1978), Helmsley-Spear v. Ft. Lee, supra. This significant date may well have been a dominant factor in the determination of the purchase price of those properties, vis-a-vis the first assessment date herein. In short, there was no demonstration of substantial similarity and, in fact, the surrounding circumstances tend to reveal substantial dissimilarity.
It is quite clear, in view of this court’s determination for the 1977 tax year, that the borough’s case hinged on its conversion value theory. Taxpayer objected to any evidence concerning condominiums or cooperatives values on the basis that such evidence was not relevant to the inquiry of the value of the subject property.
The subject property, for all years in question, has been a rental property, and it was not until March 23, 1981 that the *163 owners registered a public offering statement with the appropriate authorities. The only other evidence of an impending conversion was a note contained in the certified operating statement for the calendar year 1978 which reflected that $14,682 was expended for professional fees in connection with the “appraisal and study of condominium conversion and legal fees concerning the foreclosure of the property, condominium conversion and tenant actions.” There was no other testimony of substance concerning any concrete plans to convert the subject.
The borough’s position, however, was not affected by these facts. The crux of its theory was that for the period in question a typical investor would purchase such property at a contract amount in excess of the capitalized value of the rental stream. It argued that the climate of the market in the borough created a value for such property predicated on the net profit to be gained from the eventual sale of what were formerly rental units. The borough characterized this approach as a variant of the market approach, i.e., value based on what a willing buyer will pay a willing seller in accordance with the housing market in the borough.
The testimony in support of this theory showed a detailed picture of the housing market in Fort Lee during the period in question to approximately 1980. As of 1979-1980 there were approximately 9,000 units in the borough, with the heaviest construction occurring between 1960 and 1972. Since 1973 4,500 units have been built or converted from rental units. The borough’s expert testified clearly and confidently regarding the move to convert in the borough and in northeastern Bergen County. He testified that such movement began in the early 1970s and was animated by individual unit purchasers “fleeing” from New York City. He stated that progressive laws (e.g., N.J.S.A. 46:8A-1 ct seq. and N.J.S.A. 46:8B-1 et seq.) regulating condominiums were also a contributing factor in the rush to convert. Understandably absent from his analysis was the impact of the borough’s then confiscatory rent control ordinance which undoubtedly had a profound effect on the decision to *164 convert from rental apartments to condominiums or cooperatives.
He specifically testified that the 176-unit Plaza Building (a cooperative) was originally introduced as such in March 1973. Each unit was sold for an average price of $103,500, for a total of $18,017,436. He also testified to a March 1976 conversion of the 163-unit Regency Apartments for a total original offering price of $9,667,548 (average dwelling unit price of $59,300). He stated that the Bridge Plaza Building units (129) was converted in August 1977 for a total original sellout price of $5,290,000 (average dwelling unit price of $41,000).[6] He characterized the market as progressively becoming stronger to the point where, as of 1978, 25% of all new units in the borough had been offered as either condominium or cooperative units. He stated that the focus of the conversion phenomenon generally pertains to highrise or medium-rise buildings such as the subject, and that the resale market of individual dwelling units was extremely active and profitable.
The converted buildings testified to were documented in the appraisal report. Of the 18 buildings listed therein, which were either converted or newly constructed as nonrentals, 11 were constructed or converted well beyond the last assessment date in question.[7] Only three were in existence as of October 1, 1977 — ■ the Regency, Plaza and Bridge Plaza. He also documented the conversion into, or construction of, condominiums or cooperatives in the nearby taxing districts of Cliffside Park, Guttenberg, North Bergen and Hackensack.
There were three particular sales that were offered in support of its theory, they having been discussed previously in the context of the borough’s 1977 comparable sales approach. The *165 borough’s expert testified that he personally appraised the subject of sale number 1 (Imperial House) and testified that it was sold on an income basis in 1979 for $42,900 a unit, and further, that the seller admitted that while the building had conversion value, he did not want to convert it himself. He stated that it sold well above the capitalized income value but omitted to testify as to both the capitalized value and the excess over that amount. Sale 1(a) was a resale of the Imperial House for a total of $4,205,601, thus indicating an average unit price of $75,090. This resale was transacted about one month after the offering statement was filed with the appropriate governmental authorities. The borough’s expert testified that this was not a conversion sale but rather a sale of the entire building. This statement was apparently contradicted on cross-examination, particularly in view of the fact that it was sold one month after the offering statement was filed. Nonetheless, whether it was indicative of an entire sale of the premises or an aggregate total of individual units offered for sale, the one-year time lapse indicated an astronomical 57% increase in value for the very same individual dwelling units.
The final sale concerned the Carriage House, a fully rented structure (not yet converted as of 1980) for a total price of $15,003,619, for an indicated average price of $51,382 a unit.
The borough’s expert acknowledged that of the 80 buildings containing more than 50 dwelling units, only three were converted before 1979. It was also admitted that the Supreme Court decision in Helmsley-Spear v. Fort Lee, supra, “may have precipitated a number of people” to convert, and further, that he could not render a formula representative of the purported amount over the capitalization for which willing investors would typically buy and sell such property. However, taxpayer did admit that, following conversion, the total of the individual unit prices generally exceed the value of the property when it is determined by the capitalization-of-income approach.
Based on this record I find that, commencing with the 1978 tax year, the general market conditions in the borough demon *166 strate that a willing, fully knowledgeable investor would consider the value of a building such as the subject in terms of its development as a nonrental dwelling. I find the evidence, by a fair preponderance, fully supports the thesis that for the period in question such “vertical subdivisions” were indeed a feasible alternative to traditional income-producing properties in this rather unique taxing district.
In so finding I have not disregarded the taxpayer’s objections to the consideration of subsequent sales. I believe the decision in Almax Builders v. Perth Amboy, 1 N.J.Tax 31 (Tax Court 1980), and the cases following in its wake, effectively dispose of this objection. Of course, in the context of the borough’s theory of this case and at this juncture I do not express the belief that these sales were indicative of the value of the subject. I simply consider these sales probative of the entire conversion trend.
It should be stressed that such an approach does not implicate issues of “highest and best use.” Unquestionably, the highest and best use of this land is for residential purposes as opposed to, for instance, industrial or commercial uses. The condominium, cooperative or rental status of real property all involve residential use; they simply represent different forms of legal ownership. The statement in Bridge Park Co. v. Highland Park, 113 N.J.Super. 219, 273 A.2d 397 (App.Div.1971), is enlightening in this regard:
Defendant attempts to characterize condominium ownership as a “use” of land — i.e., since the property in question is to be “used” as a condominium, the municipality may regulate or prohibit such “use.” It is apparent, however, that after change of ownership is planned, the same buildings will be on the premises in question and the use to which they are put will also remain the same. We conclude that the word “use,” as contained in the statute above [N.J.S.A. 40:55-30], does not refer to ownership but to physical use of lands and buildings. A building is not “used” as a condominium for purposes of zoning, [at 222, 273 A .2d 397]
Accord Maplewood Village Tenants Ass'n v. Maplewood, 116 N.J.Super. 372, 282 A.2d 428 (Ch.Div.1971).
Consequently, the principle of remoteness of “use” recently restated in Hackensack Water Co. v. Haworth, 178 N.J.Super. 251, 258, 428 A.2d 934 (App.Div.1981), certif. den. 87 N.J. 378, *167 434 A.2d 1063 (1981), is not violated. See, generally, West Orange v. Goldman Estate, 2 N.J.Tax 528 (Tax Court 1981).
This approach implicates very basic principles of valuation in property taxation. The controlling standard of fair market value has been stated and restated to be “the price a willing buyer would pay a willing seller.” New Brunswick v. Tax Appeals Div., 39 N.J. 537, 543, 189 A.2d 702 (1963), and Hudson Terrace Associates v. Fort Lee, supra. Furthermore, it is equally certain that the customary approaches are by no means exclusive. Id., and see, also, Samuel Hird and Sons, Inc. v. Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965), and Passaic v. Gera Mills, 55 N.J.Super. 75, 150 A.2d 78 (App.Div. 1959), certif. den. 30 N.J. 153, 103 A.2d 174 (1959).
The borough has, to this court’s satisfaction, demonstrated what “an investor demands and obtains in a transaction with a willing seller,” New Brunswick v. Tax Appeals Div., supra 39 N.J. at 551, 189 A.2d 702. It has, in effect, demonstrated that the borough is not a developing community in terms of vacant land subdivisions, i.e., horizontal subdivisions, but rather of vertical subdivisions. It has proved the existence of the market in terms of typical investor desires.
Under this theory the borough’s expert formed his opinion of value based on the total purchase price of the aggregate individual dwelling units. According to the offering plan, the 126 dwelling units were offered at a total price of $10,554,560. The witness then generously assumed that all dwelling units would be purchased at a tenant discount of 15%, which was permitted under the plan, for a total sellout value of $8,971,376. He then deducted $971,376 for marketing expenses, for a net value, before full conversion, of $8,000,000, calculated as of the March 1981 date of the offering statement. In order to account for the time lapse, that value was discounted by 10%, resulting in an indicated total value of $7,200,000 for 1979. As to 1978, he then deducted another 10% (uncompounded) from $8,000,000 — total 20% — for an indicated total value of $6,400,000. The discount allowance, according to the witness, was based on the annual *168 appreciation of individual dwelling units in the borough, a conclusion that was subsequently impeached since no substantial credible evidence was adduced concerning the appreciation of entire buildings. Furthermore, the 1979 assessment date of October 1, 1978 was 2lh years prior to the date of the offering statement, while the 1978 assessment date was Zlh years prior thereto. Moreover, on cross-examination the borough’s expert retreated from this theory of discounting and equivocated as to the method of arriving at the respective indicated value. Furthermore, on cross-examination taxpayer succeeded in demonstrating a lack of foundation for the marketing expenses of $971,376.
The elusive concept of value has been often referred to as “the present worth of future benefits arising out of ownership to typical users or investors.” “Real Estate Appraisal and Terminology” American Institute of Real Estate Appraisers (1 ed. 1975), at 215. In New Jersey the classic statement of value for purposes of ad valorem taxation is found in Hackensack Water Co. v. Tax Appeals Div., 2 N.J. 157, 163, 65 A.2d 828 (1959); “true value of property of any kind is in essence, the value which it has in exchange for money.” This definition of value is referred to as “value in exchange.” “Appraisal of Real Estate,” supra at 23. These tenets are restated simply to highlight the fatal defect in the borough’s theory.
Fundamental to the theory of value was the unfounded assumption that as of a particular assessment date the entire amount of individual dwelling units would be sold and, as of that date, taxpayer (as a hypothetical buyer or seller) would have a cash equivalency in hand. This assumption flies in the face of evidence adduced by both parties and the controlling public law of this State that clearly demonstrates the difficulties in developing and marketing converted dwelling units. In Hampshire House v. Fort Lee, supra, Judge Smith summarized but one of a series of pertinent laws dealing with the eviction of tenants in the conversion process:
On February 19, 1976, less than three months after Brunetti[Brunetti v. New Milford, 68 N.J. 576, 350 A.2d 19], N.J.S.A. 2A:18-61.1-12 was amended and the *169 door sealed closed on municipal action in this field. The new enactment adds, as a ground for removal, conversion from the rental market to a condominum or co-operative for the first time. It incorporates a timetable and establishes a sequence of conditions precedent to eviction. Any owner who intends to convert must give his tenants 60 days’ notice of intention and furnish them with the full conversion plan. Tenants in occupancy are given the exclusive right to purchase for a period of 90 days. Should the tenant elect not to purchase, the landlord may not institute a dispossess action until three years following written demand for possession. Within 18 months following demand for possession, tenants may request the landlord to furnish a reasonable opportunity to examine and rent comparable housing. If such substitute housing is not offered prior to institution of dispossess proceedings, the court is authorized to grant up to five one-year stays of eviction. Stays are automatically renewed for additional one-year periods in cases where landlords do not offer comparable housing. However, only one stay is authorized if the landlord elects to provide the tenant with a hardship relocation compensation waiver in payment of five months rent. N.J.S.A. 2A: 18-61.l(k)-2(g), 8, 11.[8] [at 433, 412 A.2d 816]
The borough’s expert testified that although the Regency Towers offering statement was approved on March 1, 1976, he was unaware of the date of the last sales. He further admitted that while the converted Hampshire House offering statement was approved October 1, 1979, as of July 1981 it had not closed any sales. He further stated that he was aware of only one complete conversion of a recently constructed building, that being Deauville Towers. In an attempt to offset this testimony the witness explained that, because of substantial annual depreciation, an owner gained an advantage in withholding some dwelling units from sale. An additional complication concerned the borough’s conversion moratorium ordinance which was adopted in November 1979 and quickly declared void in the Hampshire House case in December 1979.
These facts, when considered together, warranted an appropriate adjustment by discounting the total net sellout price *170 in order to account for the time lag.[9] Sound appraisal practice requires such procedure in order to reflect present worth (as of the correct assessment date) of an amount to be collected at a proven future point in time, at an effective interest rate, for the number of periods from the assessment date to the date of collection. This technique is essentially identical to what is commonly expressed as the reversion factor. See “Appraisal of Real Estate,” supra at 537, and is part of a capitalization process.[10] The critical element of proof concerns the reasonably probable time lapse between the assessment date and the complete sellout. No such evidence was offered. In addition to the discount factor, an element in the capitalization process must be taken into account to reflect reasonable profit, which is roughly analogous to the return on investment in the income approach to value.
The foregoing valuation technique is sometimes referred to as the “anticipated use” or development method. “Appraisal of Real Estate,” supra at 147-148. This method was analyzed in the recent case of Genola Ventures-Shrewsbury v. Shrewsbury, 2 N.J.Tax 541 (Tax Court 1981), where the taxpayer employed the approach in the valuation of a vacant land subdivision. The Tax Court, per Judge Andrew, refused to reject the approach entirely but held that the requisite evidentiary foundation was missing. I am essentially in accord with Judge Andrew’s view. A proponent of this approach to value bears a very heavy burden of proof. Because the borough failed in certain critical *171 areas, I must reject its valuation conclusions derived from the use of this approach.
The borough did not employ an income approach as to the later years but rested on its income approach using the calendar year 1978 income and expense figures. As previously stated, the borough further declined to emphasize this approach even as to the 1977 year. It apparently, although not expressly, offered three purportedly comparable sales as being indicative of the true value of the subject for the years 1978 and 1979. Although the sales were not objectionable in terms of temporal remoteness, I do find that the necessary underlying comparability was not established. As previously stated, no adjustment was made for time in view of their subsequent sale date. These defects, as well as those previously articulated as to the 1977 tax year, all negate any potential probative force of their similarity. Venino v. Carlstadt, supra. Accordingly, I must resort to the borough’s income approach based on the 1978 calendar year expenses. I do so in view of the previous determination of the court and also in deference to the principle of stability of assessments. However, I will adjust the tax element of the capitalization rate by taking an average actual tax rate for the three years in question, again in deference to the principle of stability of assessments.
The land value of $498,800 will be capitalized at 9% interest and 2.2% average actual tax rate, resulting in an income attributable thereto of $55,865. Thus, the income attributable to the improvements is found to be $494,061. This amount is capitalized at 13.7% (9% interest, 2.2% tax rate and a 2.5% recapture rate), resulting in a total improvement value of $3,606,285. The fair market value of the subject property for the three years in question is $498,800 land, $3,606,285 improvement, for a total indicated fair market value of $4,105,085.
This case is obviously important to the borough for purposes of future litigation; the taxpayer’s concern is, of course, more immediate but of equal importance. The court must stress that its decision is based on the facts it has before it. This decision, while standing for the approval of the “anticipa *172 ted use approach” in cases of vertical subdivisions, points out that this approach is rife with uncertainties from an appraiser’s point of view. See, generally, Sub-Division Analysis — An Educational Memo, American Institute of Real Estate Appraisers (1978). In any event, the approach does have merit as long as certain critical facts are established. In particular, it must be preliminarily established that the market is indeed ripe for such vertical subdivisions. Stated differently, it must be demonstrated, by a fair preponderance of the evidence, that a typical investor would consider the development of real estate in that manner. In this case the borough has done so but yet has failed to adduce substantial credible evidence of the market value of the subject property pursuant to this method.
Lastly, it must be stated that where there is proof of a conversion market, there very well may be a method to determine the value of the property under appeal in accordance with some other technique. For example, the court can foresee an approach that established an underlying comparability of a converted property along with its preconversion income approach value. Comparison with the property under appeal may be indicative of fair market value in terms of value at a rate greater than the capitalized value of the property, vis-a-vis the comparable property value, thus making resort to the anticipated use method unnecessary under these circumstances. The long and short of this discussion is that other methods may be used, provided they are sound and reliable in terms of appraisal practice and basic legal principles. But, this court will not pass on their merit until the appropriate case is brought before it.
The Clerk of the Tax Court is directed to enter judgments (rounded) for 1977, 1978 and 1979 as follows.
Land $ 498,800
Improvements 3,606.300
$4,105,100 Total

In Hudson Terrace Apt’s v. Fort Lee, 2 N.J.Tax 457 (Tax Ct.1981), this court, in the context of a Freeze Act motion, stated that such a “conversion value” theory was inappropriate. Yet, the court expressly stated that the merits of this theory would have to be scrutinized at a later date and another case.
A 1976 matter, Fort Lee v. Center-Whiteman Corp., Docket L 11794-76, in which the borough sought to reinstate an added assessment, was consolidated with these matters for purposes of trial. That matter was decided by separate letter opinion.

The borough’s expert testified that the vacancy rate in the borough was considerably less than 5%, and probably around 1%.

These sales were objected to as being remote in terms of time. They were offered primarily in support of the borough’s conversion value theory and, aside from this initial objection, were not impeached by taxpayer.

Taxpayer disclaimed the use of a cost approach because this approach calls for a deduction for economic obsolescence which, under the circumstances of this case, could not be reliably calculated. It was taxpayer’s opinion that the subject property was in large part economically obsolete, a belief that appears to have some merit in view of the substantial vacancy rate.

 I have disregarded the capitalization technique used by taxpayer that involves the inclusion of mortgage financing as a factor. There are substantial issues yet to be resolved on this issue in ad valorem tax cases. See, generally, Glenwood Realty Co. v. East Orange, 78 N.J.Super. 67, 187 A.2d 602 (App.Div.1963); Middlesex Builders, Inc. v. Old Bridge, 1 N.J.Tax 305 (Tax Court 1980), and Petrizzo v. Edgewater, 2 N.J.Tax 197 (Tax Court 1981). The record in this matter is insufficient for the resolution of these issues.

This testimony concerning the respective buildings converted or under conversion is corroborated in general terms by the recitation of facts in Hampshire House v. Fort Lee, 172 N.J.Super. 426, 412 A.2d 816 (Law Div. 1979), where the court declared the borough’s conversion moratorium ordinance void in its entirety.

On cross-examination it was brought out that these dates referred to the point in time when the offering plan was approved by the appropriate authorities — a point when the developer could take deposits on individual units. The passage of title occurred, in most cases, well beyond this date.

Perhaps even more restrictive and cumbersome from the convertor’s point of view is L.1981, c. 226, effective July 27, 1981, whereby, subject to the qualifications enumerated therein, senior citizens may retain their tenant status notwithstanding conversion of the building for an extended period of time.

Discounting is defined in “Real Estate Appraisal and Terminology,” supra at 69, as a concept of time preference which holds that future income or benefits are worth less than the same income or benefits now, and that they decrease in value systematically as the time for their receipt is further deferred into the future. In appraisal analysis, discounting is the arithmetic procedure of applying a specific rate (usually) derived from the market to the anticipated future income stream in order to develop a present worth estimate.

 Capitalization is defined as the process of converting into present value (or obtaining the present worth of) a series of anticipated future periodic installments of net income. Id. at 34.